UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOLBY LABORATORIES, INC., <br> Plaintiff, <br> v. <br> INTERTRUST TECHNOLOGIES CORPORATION, <br> Defendant. | Case No. 19-cv-03371-EMC <br><br> **REDACTED/PUBLIC VERSION** <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** <br><br> Docket Nos. 40-4, 41 |

Plaintiff Dolby Laboratories, Inc. has filed suit against Defendant Intertrust Technologies Corporation, seeking a declaration that Dolby does not infringe eleven patents held by Intertrust. Currently pending before the Court is Intertrust's motion to dismiss. In the motion, Intertrust makes two arguments: (1) subject matter jurisdiction is lacking because there is no case or controversy between the parties once information protected by a Nondisclosure Agreement ("NDA") is "excised" from the operative complaint and (2) even if there were subject matter jurisdiction, Dolby has failed to state a claim for relief – once again, when information protected by the NDA is excised.

Having considered the parties' briefs and accompanying submissions, as well the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the motion to dismiss. The Court has subject matter jurisdiction over the instant case; however, Dolby has failed to adequately state a claim for relief.

**I.     FACTUAL & PROCEDURAL BACKGROUND**

The operative pleading in the case is the first amended complaint ("FAC"). The following facts come from the allegations in the FAC or where, as noted, other evidence in the record.

Dolby is a company involved "in the design, development, and distribution of audio and video solutions." FAC ¶ 3. Part of its business is related to digital cinema technology. "Digital cinema refers generally to the use of digital technology to master, transport, store or present motion pictures as opposed to the historical use of reels of motion picture film." FAC ¶ 21. Among Dolby's product offerings are digital cinema servers, also known as media block servers. Such servers are "used in the storage or playback of digital cinema content." FAC ¶ 23. Dolby's servers are branded either Dolby or Doremi (named after a company acquired in 2014). *See* FAC ¶¶ 24-25.

In March 2002, several major motion picture studios created a joint venture known as Digital Cinema Initiatives, LLC ("DCI"). *See* FAC ¶ 22. The primary purpose of DCI was "to establish and document voluntary specifications for an open architecture for digital cinema that ensures a uniform and high level of technical performance, reliability and quality control." FAC ¶ 22. "Among the specifications promulgated by DCI [is] the Digital Cinema System Specification ("DCSS"), which defines technical specifications and requirements for technology used in the mastering, distribution, and theatrical presentation of digital cinema content (*e.g.*, a motion picture or trailer)." FAC ¶ 23.

> [T]he digital cinema theater system framework specified by DCI in the DCSS[] includ[es] security elements, such as the "Security Manager (SM)." According to the DCI specifications, the Security Manager is contained within the media block, or Image Media Block (IMB), component of the theater system. [As noted above,] Dolby offers Doremi and Dolby branded DCI-compliant media server products containing such media blocks.

FAC ¶ 27 (emphasis added).

A.  April 2018 Letters to Dolby's Customers

In April 2018, Intertrust sent letters to companies who are customers of Dolby's media server products; the customers included AMC, Cinemark, and Regal. *See* FAC ¶ 26. (The letters were technically sent by Intertrust's attorney, Harold Barza of the Quinn Emmanuel law firm. Mr. Barza is the litigation counsel of record for Intertrust in this case.)

In the letters, Intertrust explicitly stated its belief that the companies were infringing on Intertrust's patents. *See* FAC ¶ 26. Intertrust explained: "Your theaters render motion pictures

2

using equipment certified by the [DCI] to be compliant with the [DCSS]. . . . [¶] By rendering motion pictures using unlicensed DCI certified equipment, [you have] infringed and continue[] to infringe one or more claims of at least the following [eleven] Intertrust patents." Docket No. 42-1 (Spencer Decl., Exs. A-C) (letters to AMC, Cinemark, and Regal). The eleven patents are the patents at issue in this case.[1]

In the letters, Intertrust gave one example of infringement – *i.e.*, infringement of claim 17 of the '106 patent. Claim 17 provides as follows:

> A method for managing the use of electronic content at a computing device, the method including:
>
> receiving a piece of electronic content;
>
> receiving, separately from the piece of electronic content, data specifying one or more conditions associated with rendering the piece of electronic content, the one or more conditions including a condition that the piece of electronic content be rendered by a rendering application associated with a first digital certificate;
>
> executing a rendering application on the computing device, the rendering application being associated with at least the first digital certificate, the first digital certificate having been generated by a first entity based at least in part on a determination that the rendering application will handle electronic content with at least a predefined level of security;
>
> requesting, through a rights management engine executing on the computing device, permission for the rendering application to render the piece of electronic content;
>
> determining, using the rights management engine, whether

---

[1] The eleven patents are as follows:

- '721.
- '304.
- '815.
- '602.
- '603.
- '342.
- '157.
- '158.
- '610.
- '106.
- '627.

*See* FAC ¶¶ 10-20.

3

> the one or more conditions specified by the data have been satisfied;
>
> decrypting the piece of electronic content; and
>
> rendering the decrypted piece of electronic content using the rendering application.

'106 patent, claim 17.

In its letters to the companies, Intertrust gave the following explanation as to how they infringed on claim 17.

> [Claim 17] claims a "method for managing the use of electronic content at a computing device." The method is practiced by your use of DCI certified projection equipment to render DCI compliant motion picture content in your theaters. Your use of a DCI compliant projection system comprises use of a "computing device" as that term is used in Intertrust's patent. The projection equipment receives a "piece of electronic content" when you use it to render a DCI compliant motion picture, insofar as it receives the DCP [Digital Cinema Package] from the content supplier. The projection equipment also separately receives the KDM [Key Delivery Message], which includes "data specifying one or more conditions associated with rendering the piece of electronic content," including, for example, a Trusted Device List (TDL), which restricts rendering of the content to DCI certified projectors, *i.e.*, "a condition that the piece of electronic content be rendered by a rendering application associated with a first digital certificate." The projection equipment executes "a rendering application" and is certified as DCI compliant by the projection equipment manufacturer after it is tested and confirmed to satisfy the requirements of the [DCSS], *i.e.*, "will handle electronic content with at least a predefined level of security." Your theater's screen management system will request, through the projection equipment's "rights management engine" "permission for the rendering application to render the piece of electronic content." In response to this request, the "rights management engine," *i.e.*, the projection equipment's Security Manager, will determine "whether the one or more conditions specified by the data have been satisfied," *e.g.*, whether the projection equipment is identified on the TDL. If the specified conditions are satisfied, the electronic content will be decrypted and rendered for exhibition.

Docket No. 42-1 (Spencer Decl., Exs. A-C) (letters). As noted above, the Security Manager referenced above "is contained within the media block, or Image Media Block (IMB), component of the theater system," FAC ¶ 27, and Dolby sells media block products.

Intertrust concluded its letters by stating:

> [T]his example is but one of many Intertrust inventions being used

4

> in your theaters. The use of Intertrust's patented technology
> requires a license from Intertrust.
>
> We are prepared to discuss with you a license to the relevant patents
> on commercially reasonable terms. If you wish to resolve this
> matter amicably through a licensing negotiation, please contact me
> at your earliest convenience to begin a discussion.

Docket No. 42-1 (Spencer Decl., Exs. A-C) (letters).

After Intertrust sent the letters to the companies, the companies, in turn, "sent letters to Dolby stating that Intertrust's infringement allegations implicated Doremi and Dolby branded DCI-compliant products, and requesting indemnification with respect to Intertrust's assertions." FAC ¶ 28.

B.  October 2018 Email to Dolby

Apparently, Intertrust learned of the customers' indemnification requests. On October 10, 2018, Intertrust sent an email to Dolby, noting that,

> [r]ecently, Intertrust asserted patents against theater owners using
> equipment compatible with the [DCI]. . . .
>
> We understand that exhibitors have contacted equipment makers and
> are asking about indemnification and other matters, so we thought
> we should reach out to Dolby.
>
> If Dolby's IP team would like to discuss the patent assertions with
> Intertrust, we are willing to have such a discussion.
>
> If there is interest, we can also present our company background and
> history and our various products, as well as the IPR matter.

Docket No. 43-1 (Spencer Decl., Ex. 1) (email).

Dolby accepted the invitation in late October 2018. *See* Docket No. 43-1 (Spencer Decl., Ex. 1) (email).

C.  November 2018 Nondisclosure Agreement

Subsequently, the parties executed an NDA, effective as of November 12, 2018. *See* Docket No. 41-1 (McDow Decl., Ex. 1) (NDA). The NDA included the following terms:

> **1.     Purpose.** The parties wish to discuss one or more potential
> business opportunities (the "Purpose"). In connection with the
> Purpose, each party may disclose certain technical and business
> information which the parties agree to treat as confidential pursuant
> to the terms herein.

5

> **2. Confidential Information.** "Confidential Information" means any information related to the Purpose which is disclosed by a party hereto or an Affiliate thereof ("Disclosing Party"), to the other party or to an Affiliate thereof ("Receiving Party") including, without limitation, documents, prototypes, samples, equipment, business and technical information, licensing practices and fees, product specifications and road maps, customer information and business plans.
>
> . . . .
>
> **4. Obligations Regarding Confidential Information.** Each Receiving Party . . . shall . . . (b) neither disclose nor permit access to Confidential Information except as necessary for the Purpose . . . .

Docket No. 41-1 (McDow Decl., Ex. 1).

D.  Post-NDA Events

[redacted]

E.  The Instant Lawsuit

In June 2019, Dolby initiated the instant lawsuit, seeking a declaration that it does not infringe on Intertrust's eleven patents.

F.  Intertrust's Lawsuits Against Dolby Customers

Several months later, in August 2019, Intertrust filed three lawsuits against three of Dolby's customers – namely, AMC, Cinemark, and Regal – in the Eastern District of Texas. *See*

6

Docket No. 42-1 (Spencer Decl., Exs. D-F) (complaints). Intertrust asserted infringement of the eleven patents at issue in the case at bar. According to Intertrust, its patented technology "was adopted by the cinema industry through specifications developed and promulgated by [DCI]," and the Dolby customer "infringes [the] asserted patents through its use of DCI-complaint equipment suites to show movies and other DCI-compliant content in the movie theaters that it owns and operates." Docket No. 42-1 (Spencer Decl., Ex. D) (AMC Compl. ¶¶ 13, 15). For each of the eleven patents, Intertrust gave an example of how there was infringement of at least one claim (*i.e.*, mapping the claim limitations) by the Dolby customer.

Prior to these lawsuits against the three Dolby customers, Intertrust had sued Apple in 2013 with respect to three of the eleven patents at issue (*i.e.*, the '721, '157, and '158 patents). *See* FAC ¶ 34.

## II. <u>DISCUSSION</u>

A. <u>Lack of Subject Matter Jurisdiction</u>

1. <u>Legal Standard</u>

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move for a dismissal based on lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1).

> "Rule 12(b)(1) jurisdictional attacks can be either facial or factual." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). Where there is a facial attack, a court considers only the complaint. *See id.*; *see also Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (stating that, "'[i]n a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction'"). With a factual attack, however, a court "need not presume the truthfulness of the plaintiffs' allegations" and "may look beyond the complaint." *See White*, 227 F.3d at 1242; *see also Wolfe*, 392 F.3d at 362 (noting that, in a factual motion to dismiss, the moving party presents affidavits or other evidence).

*Weiss v. See's Candy Shops, Inc.*, No. 16-cv-00661-EMC, 2017 U.S. Dist. LEXIS 122671, at *4-5 (N.D. Cal. Aug. 3, 2017); *see also Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (noting that, in a factual attack, "the allegations in the complaint are not controlling, and only uncontroverted factual allegations are accepted as true for purposes of the [12(b)(1)] motion [to dismiss]"),

In the instant case, the parties dispute whether Intertrust is making a facial or a factual

7

attack. Intertrust argues that it is making a factual attack since it is going beyond the four corners of the complaint by introducing the NDA as evidence. Dolby argues, however, that the attack should be deemed a facial one because Intertrust is not "rely[ing] on the NDA to dispute the truth of facts alleged in the FAC, but rather to facially challenge whether the recited facts are sufficient to invoke declaratory judgment." Opp'n at 14.

Dolby has the stronger position. Intertrust is only using the NDA to argue that certain allegations in the FAC should, in effect, be stricken. The Court would then be evaluating the *remaining allegations in the FAC* (not evidence outside the four corners of the pleading) to determine whether there is subject matter jurisdiction.

The only wrinkle here is that the FAC did not include as attachments (1) the April 2018 letters from Intertrust to Dolby's customers (AMC, Cinemark, and Regal) or (2) the October 2018 email from Intertrust to Dolby. The FAC only referred to and discussed these communications. That being said, the Court may still consider the actual letters and email – *i.e.*, as part of Intertrust's facial attack on subject matter jurisdiction – because of the incorporation-by-reference doctrine. *Cf. Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) ("Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint. A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion.").

2. Case or Controversy

In the instant case, Intertrust argues that this Court lacks subject matter jurisdiction over Dolby's claim for declaratory relief because (1) such relief may be awarded only where there is a case or controversy and (2) based on the allegations in the FAC, there is no case or controversy – at least, once certain allegations are effectively stricken because of the NDA. As to the first issue,

> [t]he Declaratory Judgment Act allows potential infringers to bring claims against patent holders, but only if there is an actual case or controversy between the parties. *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1327-28 (Fed. Cir. 2012). To satisfy Article III's standing requirements, a plaintiff must demonstrate that "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal

8

> interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[2] *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007), *reversed-in-part on other grounds sub nom. Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013) [emphasis added]. The Federal Circuit has held that a declaratory judgment plaintiff must allege "(1) an affirmative act by the patentee related to the enforcement of his patent rights, and (2) meaningful preparation to conduct potentially infringing activity." [*Matthews*, 695 F.3d] at 1327 (internal citations omitted).
>
> To find an affirmative act, "more is required than 'a communication from a patent owner to another party, merely identifying its patent and the other party's product line.'" *3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1378-79 (Fed. Cir. 2012). On the other end of the spectrum is an explicit infringement allegation, which shows "'there is, necessarily, a case or controversy adequate to support declaratory judgment jurisdiction.'" *See Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1362 (Fed. Cir. 2009) (quoting *Cardinal Chem. Co. v. Morton Int'l*, 508 U.S. 83, 96, 113 S. Ct. 1967, 124 L. Ed. 2d 1 (1993)). The factual scenarios that fall in between require case-by-case analysis, and the objective actions of the patentee are the subject of that inquiry. *See 3M Co.*, 673 F.3d at 1379; *Hewlett-Packard*, 587 F.3d at 1363. The patentee need not explicitly threaten to sue or demand a license, *but its actions must give reason to believe that it is asserting its rights under the patents*. *See Hewlett-Packard*, 587 F.3d at 1362-63.

*Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-cv-02848-WHO, 2018 U.S. Dist. LEXIS 172770, at *6-7 (N.D. Cal. Oct. 5, 2018) (emphasis added). "[C]onduct that can be reasonably inferred as demonstrating intent to enforce a patent can create declaratory judgment jurisdiction." *Hewlett-Packard*, 587 F.3d at 1363 (noting that the standard is objective, not subjective).

### 3. Effect of NDA

In the case at bar, Intertrust argues that the Court, in deciding whether there is a case or controversy, may not consider any allegations made in the FAC that are based on information that was exchanged between the parties pursuant to the NDA. In support of this position, Intertrust cites *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372 (Fed. Cir. 2007). There, the Federal Circuit stated, in a footnote, that, "[t]o avoid the risk of a declaratory judgment action, [the

---

[2] In *MedImmune*, "the Supreme Court rejected [the Federal Circuit's] prior, more stringent standard for declaratory judgment standing insofar as it required a 'reasonable apprehension of imminent suit.'" *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1373 (Fed. Cir. 2011). However, "[p]roving a reasonable apprehension of suit is one of multiple ways that a declaratory judgment plaintiff can satisfy the more general all-the-circumstances test to establish that an action presents a justiciable Article III controversy." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1336 (Fed. Cir. 2008).

patent holder] could have sought [the alleged infringer's] agreement to the terms of a suitable confidentiality agreement." *Id.* at 1375 n.1. In response, Dolby argues that it need not rely on any of the information exchanged pursuant to the NDA in order to establish a case or controversy.

The Court agrees with Dolby. If the Court "excludes" the NDA-related information, it is left with the following: (1) the April 2018 letters that Intertrust sent to the Dolby customers (AMC, Cinemark, and Regal), (2) the October 2018 email that Intertrust sent to Dolby, and (3) the fact that Intertrust and Dolby had meetings thereafter. (For purposes of this opinion, the Court does not consider the August 2019 lawsuits that Intertrust filed against the Dolby customers (AMC, Cinemark, and Regal).) This universe of information is sufficient to establish a case or controversy.

In reaching this holding, the Court begins its analysis with the Federal Circuit's *Arris* decision. There, the Federal Circuit stated that,

> where a patent holder accuses customers of direct infringement based on the sale or use of a supplier's equipment, the supplier has standing to commence a declaratory judgment action [*i.e.*, there is a case or controversy] if (a) the supplier is obligated to indemnify its customers from infringement liability, or (b) there is a controversy between the patentee and the supplier as to the supplier's liability for induced or contributory infringement based on the alleged acts of direct infringement by its customers.

*Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1375 (Fed. Cir. 2011)

In the instant case, (a) is not applicable. Although the FAC alleges that Dolby's customers made indemnification requests, there is nothing in the record before the Court to suggest that Dolby has indemnification agreements with its customers or that indemnification would otherwise be required as a matter of law. *See Activevideo Networks, Inc. v. Trans Video Elecs. Ltd.*, 975 F. Supp. 2d 1083, 1095 (N.D. Cal. 2013) (asking whether there is an *obligation* to indemnify – *e.g.*, under a contract or as a matter of law). *See, e.g.*, *Proofpoint, Inc. v. InNova Patent Licensing, LLC*, No. 5:11-CV-02288-LHK, 2011 U.S. Dist. LEXIS 120343, at *16 (N.D. Cal. Oct. 17, 2011) (stating that "Proofpoint has not alleged the existence of a valid [indemnification] agreement nor described its supposed obligations; it has simply indicated that the Texas Action [against its customers] has spawned indemnity 'requests'" but, "[w]ithout more, allegations of indemnity
10

requests are not enough to find a 'substantial controversy . . . of sufficient immediacy and reality'").

Because (a) is not applicable, the Court is left with (b) only – *i.e.*, is there a controversy between Intertrust and Dolby as to Dolby's liability for indirect infringement based on the alleged acts of direct infringement by its customers? Here, the Court must bear in mind that Dolby does not have to definitively show that it is liable for indirect infringement. *See Arris*, 639 F.3d at 1380 (rejecting declaratory judgment defendant's argument that the declaratory judgment plaintiff has the burden of presenting evidence that its actions indirectly infringe; "the very purpose for an accused infringer to bring a declaratory judgment action is to seek a judicial determination that a coercive claim by the patent holder would *not* succeed on the merits") (emphasis omitted). However, Dolby must show that there is "at least a *reasonable potential* that . . . a claim [for indirect infringement] *could* be brought." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904-05 (Fed. Cir. 2014) (emphasis added).

In the instant case, there is a reasonable potential that Intertrust could assert a claim for contributory infringement against Dolby. Title 35 U.S.C. § 271(c) covers contributory infringement.

> To hold a component supplier liable for contributory infringement, a patent holder must show, inter alia, that (a) the supplier's product was used to commit acts of direct infringement; (b) the product's use constituted "a material part of the invention"; (c) the supplier knew its product was "especially made or especially adapted for use in an infringement" of the patent; and (d) the product is "not a staple article or commodity of commerce suitable for substantial noninfringing use."

*Arris*, 639 F.3d at 1376; *see also Microsoft*, 755 F.3d at 904-05 (stating that, "in determining whether there is a case or controversy of sufficient immediacy to establish declaratory judgment jurisdiction we look to the elements of the potential cause of action").

In the instant case, there is a reasonable potential that element (a) could be asserted given the letters that Intertrust sent to Dolby's customers in April 2018. Also, there is a reasonable potential that element (c) could be asserted in light of Intertrust's October 2018 email to Dolby, in which Intertrust referenced its claim of patent infringement against Dolby's customers. *See*

11

Docket No. 43-1 (Spencer Decl., Ex. 1) (email) (stating that, "[r]ecently, Intertrust asserted patents against theater owners using equipment compatible with the [DCI]" and "[w]e understand that exhibitors have contacted equipment makers and are asking about indemnification and other matters, so we thought we should reach out to Dolby"). As for element (d), there is a reasonable potential that it could be asserted if only because of the nature of the products that Dolby sells (*i.e.*, DCI-compliant media block servers). *Cf. Arris*, 639 F.3d at 1378 (noting that declaratory judgment plaintiff's products were "designed specifically for use under [certain] standards for VoIP, suggesting that they are 'especially made or especially adapted' for a use that infringes the patents-in-suit and are 'not . . . staple article[s] or commodity[ies] of commerce suitable for substantial noninfringing use'").[3] That, according to Intertrust in its letter to Dolby's customers, DCI-compliant media block servers (such as those made by Dolby) allegedly infringe the patents at issue further implies the applicability of (c).

Finally, for element (b) – *i.e.*, are Dolby's products material to the alleged direct infringement by the customers? – here, *Arris* provides some guidance. In *Arris*, the declaratory judgment plaintiff was Arris, and the declaratory judgment defendant BT. BT had patents related to cable networks that offer Voice over Internet Protocol ("VoIP") telephone services. BT alleged that one of Arris's customers, Cable One, had infringed BT's patents "by using equipment purchased from Arris to implement VoIP services on Cable One's network." *Id.* at 1371. Arris filed suit against BT, seeking a declaratory judgment that, *inter alia*, it did not infringe.

The Federal Circuit held that there was, in fact, a case or controversy between BT and Arris regarding Arris's liability for contributory infringement. It began by noting that, "when the holder of a patent with method claims accuses the supplier's customers of direct infringement based on their use of the supplier's product in the performance of the claimed method, an implicit assertion of indirect infringement by a supplier may arise." *Id.* at 1375.

---

[3] One of the main cases on which Intertrust relies, *see* Reply at 11, is distinguishable because it concluded that there was not a potential contributory infringement case against the declaratory judgment plaintiff because, even though the first two elements above had been sufficiently pled, the second two elements had not been. *See BroadSign Int'l, LLC v. T-Rex Prop. AB*, No. 16 CV 04586-LTS, 2018 WL 357317, at *4 (S.D.N.Y. Jan. 10, 2018).

12

The Federal Circuit then pointed out that BT's presentation of infringement contentions (the presentation was initially made to Cable One and then later to BT) "*explicitly and repeatedly* singled out Arris' products used in Cable One's network to support its infringement contentions." *Id.* at 1377 (emphasis added); *see also id.* at 1378 (stating that "BT's extensive focus on Arris' . . . products in its infringement contentions implies that Arris' products are being used as a 'material part' of the allegedly infringed invention").

In *Applied Materials Inc. v. Cohen*, No. 17-cv-04990-EMC 2018 U.S. Dist. LEXIS 45867 (N.D. Cal. Mar. 20, 2018), this Court likewise found a case or controversy. The declaratory judgment defendant (Mr. Cohen) had previously sued a customer (TSMC) of the declaratory judgment plaintiff (Applied) in Texas; the infringement theory against TSMC was based on Applied's products specifically. *See id.* at *7-8.

The instant case differs from *Arris* and *Applied* in that, in each of those cases, the declaratory plaintiff's products were specifically identified in the declaratory judgment defendant's infringement contentions or pleadings. Here, Intertrust's letters to the Dolby customers in April 2018 (which included some mapping of claim limitations) do not specifically call out Dolby's products by name.

Nonetheless, Intertrust's letters to the Dolby customers indicate that it is claiming infringement by the customers because they are DCI compliant, and, as reflected in the letters, compliance with DCI specifications seems to require a Security Manager which is contained within an Image Media Block. Dolby's products come into play because Dolby sells DCI-compliant media block servers, which is apparently where the Image Media Block is housed. *See* FAC ¶ 27. The Image Media Block with a Security Manager appears to be a material part of the alleged infringement. *Cf. Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1331 (Fed. Cir. 2010) ("agree[ing] with Netgear that a product that only defragments messages cannot constitute a 'material part' of a claimed invention drawn solely to fragmentation"). Although Dolby may not be the sole supplier of such infringing devices (at least the complaint does not so allege), Intertrust sent an email directly to Dolby after threatening the Dolby customers, and, in the email, Intertrust specifically expressed its understating that Dolby is a supplier; thus, there is a reasonable potential

13

1  that Dolby's products in particular are material to the alleged direct infringement by the

2  customers.

3        Accordingly, there is a " reasonable potential that . . . a claim [for contributory

4  infringement] could be brought" by Intertrust against Dolby. *Microsoft*, 755 F.3d at 904-05.

5  Intertrust has engaged in "conduct that can be reasonably inferred as demonstrating intent to

6  enforce a patent," which "can create declaratory judgment jurisdiction." [4] *Hewlett-Packard*, 587

7  F.3d at 1363; *see also MedImmune*, 549 U.S. at 127 (stating that, to satisfy Article III's standing

8  requirements, a plaintiff must demonstrate that "the facts alleged, under all the circumstances,

9  show that there is a substantial controversy, between parties having adverse legal interests, of

10  sufficient immediacy and reality to warrant the issuance of a declaratory judgment"); *Intel*, 2018

11  U.S. Dist. LEXIS 172770, at *6-7 (stating that "[t]he patentee need not explicitly threaten to sue

12  or demand a license, but its actions must give reason to believe that it is asserting its rights under

13  the patents"); *cf. Activevideo Networks, Inc. v. Trans Video Elecs. Ltd.*, 975 F. Supp. 2d 1083,

14  1087 (N.D. Cal. 2013) (noting factors that have been considered by courts, including "the strength

15  of any threatening language in communications between the parties" and "the depth and extent of

16  infringement analysis conducted by the patent holder").

17        The Court therefore concludes that there is a case or controversy between the parties

18  supporting subject matter jurisdiction over the instant case and, to this extent, Intertrust's motion

19  to dismiss is denied.

20  B.    <u>Failure to State a Claim for Relief</u>

21        Intertrust argues that, even if there is subject matter jurisdiction in the instant case (*i.e.*, a

22  case or controversy between the parties), the Court should still dismiss the declaratory relief

---

[4] 

14

1  claims because ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

2  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

3  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

4  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

5  ■■■■■■■■■■■■■■■

6  Intertrust's argument is not persuasive. ■■■■■■■■■■■■■■■■■■■■■■■

7  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

8  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

9  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Intertrust, however, does make a secondary argument that has merit – *i.e.*, that Dolby does not provide an explanation of *how* a particular limitation is missing in its products. *See, e.g.*, Reply at 14-15. Dolby does not clearly address this argument in its papers. The Court therefore dismisses Dolby's claims for declaratory relief, but the dismissal is without prejudice and Dolby has leave to amend to cure the above deficiency.

C.   Meet and Confer re Sealing

As a final matter, the Court addresses two pending motions to file under seal that are related to Intertrust's motion to dismiss. *See* Docket Nos. 31, 40 (motions).

The first motion to file under seal has been filed by Dolby. Dolby seeks to file under seal certain portions of the FAC. *See* Docket No. 31 (motion). Intertrust claims that the information is confidential because it is protected by the NDA between the parties. *See* Docket No. 34 (Guledjian declaration).

The second motion to file under seal has been filed by Intertrust. *See* Docket No. 40 (motion). Intertrust seeks to file under seal certain portions of its motion to dismiss, again based on the NDA. *See* Docket No. 40-1 (Guledjian declaration). Dolby has opposed in part. *See* Docket No. 42 (Opp'n at 5) ("Dolby does not admit to the confidentiality of any portion of Intertrust's Motion to Dismiss (or Dolby's FAC), or concede that any portion is subject to the parties' NDA. Rather, in the interest of narrowing the issues for this Court's resolution, Dolby has focused this opposition on those portions where Intertrust's Motion to Seal plainly overreaches. In

doing so, Dolby does not intend to waive its ability to challenge any claim of confidentiality with respect to Intertrust's infringement allegations against Dolby.").

The Court directs the parties to meet and confer to see if they can reach agreement on a more narrowly tailored sealing – or to see if they can reach agreement that nothing needs to be sealed in light of the Court's ruling herein.

Similarly, the Court orders the parties to meet and confer to determine what, if any, portion of this order should be filed under seal. The Court has, out of an abundance of caution, sealed certain portions but more narrow tailoring seems appropriate.

The parties shall report back to the Court on their meet and confer within a week of the date of this order.

### III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Intertrust's motion to dismiss. The motion to dismiss for lack of subject matter jurisdiction is denied; the motion to dismiss for failure to state a claim for relief is granted. Dolby has leave to amend within three weeks of the date of this order. Within a week of the date of this order, the parties are to report back on their meet and confer with respect to the issue of sealing.

This order disposes of Docket No. 41.

**IT IS SO ORDERED**.

Dated: November 6, 2019

_____
EDWARD M. CHEN
United States District Judge