1
2
3
4
5
6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

7

8

9

10

11

12

DOLBY LABORATORIES, INC.,

                    Plaintiff,

        v.

INTERTRUST TECHNOLOGIES
CORPORATION,

                    Defendant.

Case No.  19-cv-03371-EMC

**CLAIM CONSTRUCTION ORDER**

13

14                            **I.        INTRODUCTION**

15        This case involves ten patents that Defendant and Counterclaimant Intertrust Technologies

16    Corp. ("Intertrust") accuses Declaratory-Judgment Plaintiff Dolby Laboratories, Inc. ("Dolby") of

17    infringing.  On November 3, 2020, the parties appeared before the Court for a claim construction

18    hearing.  The parties have asked the Court to interpret thirteen terms (several of which will share

19    the same construction) that appear in various claims of the patents-in-suit.  *See* Docket No. 101

20    ("Joint Stip.").  For the reasons given in the following discussion, the Court adopts the

21    constructions identified below.

22                            **II.        BACKGROUND**

23    A.        Earlier Proceedings

24        The patents at issue in this action relate to rights management of digital cinema

25    technology.[1]  Dolby describes itself as "a global leader in the design, development, and

26

27    _____

28    [1] "Digital cinema refers generally to the use of digital technology to master, transport, store or
      present motion pictures as opposed to the historical use of reels of motion picture film."  Docket
      No. 61-4 ("SAC") ¶ 20.

United States District Court
Northern District of California

distribution of audio and video solutions."  Docket No. 61-4 ("SAC") ¶ 3.  Intertrust claims to have "pioneered digital rights management" and, more specifically, to have "invented methods and systems for protecting high-value content, such as original-release commercial motion pictures, when these content assets are distributed to exhibitors, such as commercial movie theaters."  Docket No. 63 ("Counterclaim") ¶¶ 8, 10.

In 2002, several major motion-picture studios launched a joint venture known as Digital Cinema Initiatives, LLC ("DCI").  SAC ¶ 21.  "Among the specifications promulgated by DCI are the Digital Cinema System Specifications ('DCSS'), which define[] technical specifications and requirements for technology used in the mastering, distribution, and theatrical presentation" of commercial films.  *Id.* ¶ 22.  "Such technology includes servers used in the storage or playback of digital cinema content, sometimes referred to as . . . media block servers" or image media blocks.  *Id.*; *see also* Counterclaim ¶ 15-16.  Dolby's product offerings include media block servers.  *See* SAC ¶ 26.

In early 2018, Intertrust sent letters to some of the largest movie-theater chains—all Dolby customers—alleging that they "were infringing the Patents-in-Suit by rendering movies" on "digital cinema equipment compliant with" DCSS and other DCI requirements.  SAC ¶ 25.  After corresponding with the theaters, in early 2019 "Intertrust directed communications to Dolby regarding licensing of the Patents-in-Suit, including multiple emails and several in-person meetings."  *Id.* ¶ 28.  Dolby ultimately "rejected Intertrust's royalty demands and communicated to Intertrust that it did not agree that compliance with the DCI specification showed infringement of Intertrust's Patents-in-Suit."  *Id.* ¶ 31.

Dolby initiated this action against Intertrust in June 2019, seeking a declaratory judgment of non-infringement of the asserted patents.  *See* Docket No. 54 ("Order") at 6.  Around the same time, Intertrust sued three of Dolby's customers (*i.e.*, the aforementioned movie-theater chains) in the Eastern District of Texas, asserting infringement of the same patents.  *Id.* at 6-7; *see also* Docket No. 107-4, *Intertrust Techs. Corp. v. Cinemark Holdings, Inc.*, No. 2:19-cv-00266-JRG (E.D. Tex. July 7, 2020) ("*Cinemark*").  Dolby filed the operative complaint in this case in

United States District Court
Northern District of California

1  November 2019.[2]  *See* SAC.  Intertrust responded by filing an answer, affirmative defenses, and

2  counterclaims for patent infringement.[3]  *See* Docket No. 63.

3  In August 2020, the Court approved the parties' Joint Stipulation Regarding Claim Terms,

4  which identified the thirteen contested terms that were addressed at the hearing and set forth the

5  parties' proposed constructions.  *See* Joint Stip. at 2-4.  The parties subsequently filed an opening

6  claim construction brief (by Intertrust), a responsive brief (by Dolby), and a reply brief (by

7  Intertrust).  *See* Docket No. 107 ("Opening Br."), No. 109 ("Responsive Br."), and No. 110

8  ("Reply Br.").  On October 20, 2020, the parties conducted a technology tutorial.  *See* Docket No.

9  116.  The claim construction hearing followed on November 3, 2020.  *See* Docket No. 125.

10  B.    Patents-in-Issue

11  Intertrust alleges that Dolby has infringed ten patents: No. 6,157,721 (the "'721 Patent"),

12  No. 6,640,304 (the "'304 Patent"), No. 6,785,815 (the "'815 Patent"), No. 7,340,602 (the "'602

13  Patent"), No. 7,406,603 (the "'603 Patent"), No. 7,694,342 (the "'342 Patent"), No. 8,191,157 (the

14  "'157 Patent"), No. 8,191,158 (the "'158 Patent"), No. 8,931,106 (the "'106 Patent"), and No.

15  9,569,627 (the "'627 Patent").

16  The '721 Patent is titled "Systems and Methods Using Cryptography to Protect Secure

17  Computing Environments."  *See* Docket No. 107-21 ("'721 Patent").  According to the patent's

18  abstract, the invention protects "[s]ecure computation environments . . . from bogus or rogue load

19  modules, executables and other data elements through use of digital signatures, seals and

20  certificates issued by a verifying authority."  *Id.*  That verifying authority, "which may be a trusted

21  independent third party," "tests the load modules or other executables to verify that their

22

23  _____

24  [2] Earlier, Intertrust successfully moved to dismiss Dolby's First Amended Complaint ("FAC").
   Intertrust argued (1) that the Court lacked subject-matter jurisdiction because there was no case or

25  controversy between the parties and (2) that the FAC failed to state a claim for relief.  Order at 1.
   The Court rejected the first argument but agreed with the second.  *See id.* at 14-15.  The Court thus

26  dismissed Dolby's complaint but gave it leave to amend.  *Id.* at 15.  The SAC was filed on
   November 27, 2019.

27  [3] Intertrust alleges past and/or continuing contributory infringement by Dolby of the ten patents-
   in-suit (four of which have now expired), and seeks relief in the form of, *e.g.*, injunctions, lost-

28  profit damages, reasonable royalties, and treble damages for willful infringement.  *See* Docket No.
   63 (Prayer for Relief).

1  corresponding specifications are accurate and complete, and then digitally signs the load module

2  or other executable based on tamper resistance work factor classification."  *Id.*  The patent also

3  describes how "digital signature algorithms" (or subsets thereof) may be used to limit security

4  breaches.  *See id.*

5       The '304, '157, and '158 Patents arise from a common "family" of inventions.  *See* Docket

6  No. 121 ("Tutorial Tr.") at 18.  All three are titled "Systems and Methods for Secure Transaction

7  Management and Electronic Rights Protection."  *See* Docket Nos. 107-3 ("'304 Patent"), 107-7

8  ("'157 Patent"), and 107-2 ("'158 Patent").  The abstract of the '304 Patent states that the

9  invention is installed on electronic appliances (*e.g.*, computers) in order to "provide a distributed

10  virtual distribution environment (VDE) that may enforce a secure chain of handling and control,

11  for example, to control and/or meter or otherwise monitor use of electronically stored or

12  disseminated information."  *See* '304 Patent.  The VDE "may be used to protect rights of various

13  participants in electronic commerce and other . . . electronic-facilitated transactions," and it is

14  capable of establishing security along multiple "node[s]" of an operating system.  *Id.*

15       The '342 and '106 Patents also share a common family.  *See* Tutorial Tr. at 25.  They are

16  titled "Systems and Methods for Managing and Protecting Electronic Content and Applications."

17  *See* Docket Nos. 107-19 ("'342 Patent") and 107-8 ("'106 Patent").  The '342 Patent's abstract

18  discloses that the inventions use "[r]ights management software/hardware . . . to attach and detect

19  [various types of] credentials, and to enforce rules that indicate how content and applications may

20  be used if certain credentials are present or absent."  *See* '342 Patent.  In one preferred

21  embodiment of the patents, "an application may condition access to a piece of electronic content

22  upon the content's possession of a credential from a first entity, while the content may condition

23  access upon the application's possession of a credential from a second entity and/or the user's

24  possession of a credential from a third entity."  *Id.*  Using credentials in this way allows for

25  "complex and flexible control arrangements" but is based on "simple rights management

26  technology."  *Id.*

27       The '602 Patent is titled "Systems and Methods for Authenticating and Protecting the

28  Integrity of Data Streams and Other Data."  *See* Docket No. 107-27 ("'602 Patent").  The abstract

United States District Court
Northern District of California

4

states that this invention "enable[es] a recipient of a cryptographically-signed electronic communication to verify the authenticity of the communication on-the-fly using a signed chain of check values," where "each check value in the chain" is "constructed from the original content of the communication." *Id.* The patent provides "[f]ault tolerance" as part of this process "by including error-check values in the communication that enable a decoding device to maintain the chain's security in the face of communication errors." *Id.* In one preferred embodiment, the patent enables secure access to a content file "by constructing a hierarchy of hash values from the file," which can ultimately "be used to efficiently verify the authenticity of arbitrary portions of the content file." *Id.*

The '815, '603, and '627 Patents at issue elsewhere in the litigation do not contain any disputed claim terms and are not addressed here.

## III.     DISCUSSION

A.     Legal Standard

Claim construction is a question of law, although it may have factual underpinnings. *See, e.g.*, *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1357 (Fed. Cir. 2016). The process "serves to define the scope of the patented invention and the patentee's right to exclude." *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1367 (Fed. Cir. 2017); *see also O2 Micro Int'l Ld. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (stating that the purpose of claim construction is "to determin[e] the meaning and scope of the patent claims asserted to be infringed") (internal quotation marks omitted).

Claim construction follows longstanding principles of interpretation in patent law. First, "the claims of a patent define the invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). The words of a claim are generally given their "ordinary and customary meaning," which is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal quotation omitted).[4] Such a person "read[s] the

---

[4] "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Phillips*, 415 F.3d at 1313.

United States District Court
Northern District of California

claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. At other times claim language requires more active interpretation, especially since "patentees frequently use terms idiosyncratically." *Id.* In such situations, the court looks to "those sources [of information] available to the public that show what a person of skill in the art would have understood disputed claim language to mean," such as "the words of the claims themselves, the . . . specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (quotations and citations omitted).

As the previous statement suggests, courts first look to intrinsic evidence, as "the claims themselves provide substantial guidance as to the[ir] meaning." *Id.* The "context in which a term is used in the asserted claim," "[o]ther claims of the patent in question, both asserted and unasserted," and "[d]ifferences among claims" are all instructive. *Id.* The claims must also "be read in view of the specification," which is "the single best guide to the meaning of a disputed term" and often "dispositive." *Id.* at 1315.

Courts "normally do not interpret claim terms in a way that excludes disclosed examples in the specification." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007). At the same time, "limitations from the specification are not to be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). This is because "the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." *Phillips*, 415 F.3d at 1323. Further, the effect and force of the specification may vary. "[U]pon reading the specification in . . . context, it will [often] become clear whether the patentee is setting out specific examples of the invention to accomplish [its] goals, or whether the patentee instead intends for the claims and the embodiments in the specifications to be strictly coextensive." *Id.*

1    In addition to consulting the specification, "the court should also consider the patent's

2    prosecution history," which is another form of intrinsic evidence.  *See Markman v. Westview*

3    *Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996) (citing *Graham v.*

4    *John Deere Co.*, 383 U.S. 1, 33 (1966)).  However, because the "prosecution history represents an

5    ongoing negotiation between the [Patent and Trademark Office] and the applicant," it "often lacks

6    the clarity of the specification" and is therefore "less useful" for purposes of claim construction.

7    *Phillips*, 415 F.3d at 1317.

8    Though intrinsic evidence—the claims, specification, and prosecution history—has

9    primacy at claim construction, courts may also consider the extrinsic record, including expert and

10   inventor testimony, dictionaries, and learned treatises.  *See id.* at 1317-18.  Technical dictionaries

11   in particular "can assist the court in determining the meaning of particular terminology to those of

12   skill in the art," as they "endeavor to collect the accepted meanings of terms used in various fields

13   of science and technology."  *Id.* at 1318.  And expert testimony can "provide background on the

14   technology at issue," helping "to explain how an invention works, to ensure that the court's

15   understanding of the technical aspects of the patent is consistent with that of a person of skill in

16   the art, or to establish that a particular term in the patent or the prior art has a particular meaning in

17   the pertinent field."  *Id.*  "[C]onclusory, unsupported assertions," however, are not helpful, nor

18   should the court accept expert testimony "that is clearly at odds with the claim construction

19   mandated by the claims themselves, the written description, and the prosecution history."  *Id.*

20   (internal quotation omitted).

21   B.    Analysis

22   The parties have identified thirteen claim terms, divided into nine groups, for the Court to

23   construe.  The Court addresses each group in turn.

24   ///

25   ///

26   ///

27   ///

28   ///

United States District Court
Northern District of California

1.    <u>"rule" & "control information"</u>

| Claim Term | Claim(s) | Intertrust's Proposed Construction | Dolby's Proposed Construction | Court's Construction |
|---|---|---|---|---|
| "rule" | '158 Patent (claim 4) | "information and/or programming controlling operations on or use of resources" | "information, such as executable code or associated data, related to controlling use of a digital file" | "information and/or programming controlling operations on or use of a digital file or electronic content item" |
| "control information" | '304 Patent (claim 24) | | | |

Claim 4 of the '158 Patent recites "[a] method utilizing an electronic appliance comprising a processor and a memory encoded with program instructions that, when executed by the processor, cause the processor to perform the method." '158 Patent at Clm. 4.  The steps comprising the method include:

- receiving, at the electronic appliance, independently from the electronic content item via separate delivery and protected separately from the electronic content item, a **rule** specifying one or more permitted uses of the electronic content item;

- determining that the requested use of the electronic content item corresponds to a permitted use of the electronic content item specified in the **rule**.

*Id.* Claim 24 of the '304 Patent recites "[a] method for monitoring use of a digital file at a computing system." '304 Patent" at Clm. 24.  The steps comprising the method include:

- receiving a first entity's **control information** separately from the digital file;
- using the first entity's **control information** to govern, at least in part, a use of the

1    digital file at the computing system.

2    *Id.*

3    The question here "is whether 'rule' and 'control information' can only control use of a

4    digital file," as Dolby argues, or whether the claim terms can also apply to the "use of other types

5    of resources," as Intertrust contends.[5]  *See* Docket No. 130 ("Hearing Tr.") at 6-7; *see also*

6    Responsive Br. at 1 ("The parties' dispute centers on whether the 'rule' / 'control information' is

7    for controlling use of a digital file or ***any resources***.").[6]  Intertrust's primary argument is that its

8    construction is identical to the one recently adopted by the Eastern District of Texas in *Cinemark*,

9    a case that involves many of the same patents and claim terms as those contested here.  *See*

10   Opening Br. at 1-2; *Cinemark* at 36.  Intertrust characterizes the *Cinemark* court's construction as

11   "a reasonable middle ground on which all parties [in that case] ultimately agreed" and notes that

12   the court expressly rejected the construction proposed by Dolby here.  Opening Br. at 1-2; *see also*

13   *Cinemark* at 33, 36 (setting forth the parties' suggested interpretations and "find[ing] the proper

14   construction somewhere between these two proposals").  Dolby counters that Intertrust's

15   "proposal of 'controlling operations on or use of ***resources***' . . . is not consistent with the actual

16   claim language," which is exclusively directed to a "digital file" in the '304 Patent and to an

17   "electronic content item" in the '158 Patent.  Responsive Br. at 1-2.  Further, Dolby asserts that

18   "rule" and "control information" cannot encompass all types of "resources," as Intertrust's

19   proposal requires, since the relevant claims themselves distinguish electronic content from such

20   other resources as a "computing system," a "processor," and "memory."  *Id.* at 2.

21   As Intertrust emphasizes, the *Cinemark* court noted that "[t]he 'importance of uniformity

22   in the treatment of a given patent' suggests a level of deference to previous court constructions."

23   *Id.* at 11 (quoting *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008)).  A

24   district court's claim constructions "in cases involving the same patent" are therefore "entitled to

---

[5] In its opening brief, Intertrust also objected to Dolby's use of "related to" in its proposed construction.  *See* Opening Br. at 2-4.  Dolby subsequently removed that language from its proposed construction "in an effort to narrow the disputes between the parties."  Responsive Br. at 1 n.1.

[6] Unless otherwise indicated, additional emphasis is present in the original quotations.

United States District Court
Northern District of California

substantial weight" or, as Intertrust puts it, "reasoned deference." *Id.* (quoting *TPQ Dev., LLC v. Intuit, Inc.*, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014); Reply Br. at 1. Indeed, the *Cinemark* court tailored its construction of "rule" and "control information" to that of this District in *Intertrust Technologies Corp. v. Microsoft Corp.*, 275 F. Supp. 2d 1031 (N.D. Cal. 2003), a case that involved patents distinct from, but related to, those at issue here and in *Cinemark*. *See Cinemark* at 34 n.9, 38-40; Docket No. 107-6 ("*Microsoft*") at 35-36. Dolby responds by insisting that courts are "not bound to automatically accept the claim construction of another district court" and that they are obliged "to render [their] own independent claim construction." Responsive Br. at 6 (quoting *Aircraft Tech. Publishers v. Avantext, Inc.*, 2009 WL 3817944, at *3 (N.D. Cal. Nov. 10, 2009). But there are strong policy grounds for according "substantial weight" and "reasoned deference" to another district court's construction of identical claim terms, most obviously the benefits of having patents of nationwide scope interpreted the same way throughout the federal system. *See TQP Dev.*, 2014 WL 2810016 at *6 (affirming that "the Court . . . will not depart from [previous claim] constructions absent a strong reason for doing so"). While this Court is therefore not bound by the *Cinemark* court's rulings, it is nevertheless prudent to hew to that court's substantive constructions unless there are convincing reasons not to.

In this instance, however, Dolby correctly observes that "the *Cinemark* court's analysis did not discuss the particular issue presented here," *i.e.*, whether "rule" and "control information" should be restricted to the "use of a digital file" or "electronic content item" rather than to the "use of resources" more generally. *See* Responsive Br. at 1 n.3. Dolby is also correct that the relevant claim language is exclusively directed to either "a digital file" or an "electronic content item." Intertrust responds that "electronic content items and digital files ***are*** resources," and that "the specification confirms that controlled content may be contained in 'files and/or ***other information resources***.'" Reply Br. at 1 (quoting '158 Patent at 252:10-11). But the first argument ignores Dolby's point and the second seems to acknowledge that some limitation on "resources" is warranted here. In fact, counsel for Intertrust represented at the claim construction hearing that its proposal was always intended to refer to "information resources" (rather than, for example, hardware resources), Hearing Tr. at 9, and that "electronic content item" would also be an

United States District Court
Northern District of California

United States District Court
Northern District of California

1    acceptable limitation to impose on these claim terms, *id.* at 13.  Counsel for Dolby likewise agreed

2    that limiting the terms' application to either "a digital file" or an "electronic content item" would

3    be appropriate.  *Id.* at 11-12.  As the claims themselves employ the term "electronic content item"

4    but not "information resources," the Court adopts the former (along with the mutually agreed-on

5    "digital file") as part of its construction.  *See Phillips*, 415 F.3d at 1314 (stating that "the claims

6    themselves provide substantial guidance as to the[ir] meaning").

7          The Court therefore construes the terms "rule" and "control information" to mean

8    "information and/or programming controlling operations on or use of a digital file or electronic

9    content item."

10         2.    "receiving . . . separately" & "receiving, separately"

| Claim Term | Claim(s) | Intertrust's Proposed Construction | Dolby's Proposed Construction | Court's Construction |
|---|---|---|---|---|
| "receiving . . . separately" / "receiving, separately" | '304 Patent (claim 24)<br><br>'157 Patent (claims 69, 84, 99)<br><br>'106 Patent (claim 17) | "receiving over different paths, or from different sources, or at different times" | "receiving in a different package and/or via delivery at a different time, over a different path, or from a different source" | "receiving in a different package and/or via delivery at a different time, over a different path, or from a different source" |

26         Claim 24 of the '304 Patent, one of the claims in which the contested terms are found,

27    recites "[a] method for monitoring use of a digital file at a computing system."  '304 Patent at

28    Clm. 24.  The steps comprising the method include:

United States District Court
Northern District of California

- **receiving** a first entity's control information **separately** from the digital file.

*Id.* Additionally, Claim 69 of the '157 Patent recites "[a] method performed by an electronic appliance comprising a processor and a memory encoded with program instructions that, when executed by the processor, cause the electronic appliance to perform the method." '157 Patent at Clm. 69. The steps comprising the method include:

- **receiving**, by the electronic appliance, **separately** from the first piece of electronic content, a first key, the first key being associated with the first piece of electronic content, and the first key being encrypted at least in part.

*Id.* Lastly, Claim 17 of the '106 Patent recites "[a] method for managing the use of electronic content at a computing device." '106 Patent at Clm. 17. The steps comprising the method include:

- **receiving, separately** from the piece of electronic content, data specifying one or more conditions associated with rendering the piece of electronic content, the one or more conditions including a condition that the piece of electronic content be rendered by a rendering application associated with a first digital certificate.

*Id.*

The parties agree that the contested terms "should be construed to include receiving delivery at a 'different time,' over a 'different path,' or from a 'different source.' The dispute centers on whether the term also covers receiving 'in a different package.'" Opening Br. at 4; *see also* Responsive Br. at 2.

Intertrust points out that the parties in *Cinemark* agreed to the construction it now proposes and that the *Cinemark* court adopted the parties' joint interpretation. Opening Br. at 4-5; Docket No. 107-9 ("Tex. Agreed Terms") at 6-13. Intertrust also argues that the specification of the '157 Patent defines the "separate[]" delivery of rules and controls (as distinct from content) as including "delivery **at a different time, over a different path, and/or by a different party**.'" *Id.* at 4 (quoting '157 Patent at 127:24-27). In contrast, Intertrust contends, the specification does not define delivery "simply by virtue of receipt in 'different package[s],'" which the disjunctive "and/or" construction proposed by Dolby would entail. *See id.* at 4-5.

Dolby counters "that the 'receiving . . . separately' phrase may include receipt in separate packages" given "the plain and ordinary meaning of 'separate receipt.'" Responsive Br. at 2. Dolby supports this argument with a hypothetical: if "Person A mails Letter 1 and Letter 2 to Person B in two different envelopes on the same day via the same postal service," and "Person B receives Letter 1 and Letter 2 on the same day via the same postal service," the result is "separate receipt in separate envelopes (different packages)," even though the letters were received as part of "the same delivery (same time, path, and source)." *Id.* Dolby also stresses that the '157 Patent's specification "explicitly contemplates distribution" of electronic content and control information "using separate containers" or packages.[7] *Id.* at 3 (paraphrasing '157 Patent at 17:21-26). Finally, Dolby ties its proposed construction here to that of the closely related claim terms "receiving . . . separately . . . and via separate delivery," whose construction is addressed below.[8] Dolby points out (and Intertrust acknowledges) that the '157 Patent expressly defines "separate delivery" to mean delivery "at a different time, over a different path, and/or by a different party." *Id.* at 3-4, Opening Br. at 4; *see also* '157 Patent at 127:24-27 (stating that content may be "delivered separately (e.g., at a different time, over a different path, and/or by a different party)"). Since the parties agree that the "receiving . . . separately . . . and via separate delivery" claim term is narrower than "receiving . . . separately" and adds an additional requirement to the process, *see* Hearing Tr. at 21, 25-26, 28, 32, Dolby draws the logical conclusion that "receiving . . . separately" must encompass more than receipt at different times, over different paths, or from different sources, *id.* at 32-33.

In its reply, Intertrust acknowledges that "items, such as content and control information, *may* be received in different packages," and avers that its "construction is consistent with that disclosure." Reply Br. at 1-2 (emphasis added). It insists, however, that "receiving . . . separately" is not "satisfied merely by receipt in different packages." *Id.* at 2. Underlying this

---

[7] The parties explained at the claim construction hearing that a "package," as used by the relevant patents, may refer to an "electronic container," Hearing Tr. at 18, or a non-physical "data structure," *id.* at 28.

[8] At the hearing the parties addressed these two sets of claim terms together, agreeing that they "are closely related." Hearing Tr. at 14.

1     contention is Intertrust's belief that two pieces of information sent from the same source, along the

2     same path, and at the same time are *not* received "separately," even if they arrive in different

3     "packages."  *See id.*  In this vein, Intertrust suggests that Dolby's mailed letter hypothetical proves

4     the opposite of what it purports to, as it is analogous "to control information being distributed

5     with, not separately from, content."  *Id.* at 2 n.6.

6          The Court agrees with Dolby's proposed construction.  As an initial matter, Intertrust's

7     reliance on the fact that the parties in *Cinemark* stipulated to the construction Intertrust proposes

8     here is largely misplaced, as Dolby is not a party to that case and is not beholden to the

9     constructions voluntarily agreed to by defendants there.  The *Cinemark* court also did not offer any

10    analysis of the parties' stipulated construction or whether it represented the best interpretation

11    after hearing argument on the issue.  *See* Tex. Agreed Terms at 6-13.  The court's adoption of

12    Intertrust's proposed construction is therefore entitled to less weight than it would be if the parties

13    in *Cinemark* had actually litigated the question.  Additionally, Intertrust's and Dolby's contrasting

14    takeaways from the mailed-letter hypothetical here are inconclusive, as both offer colorable

15    arguments for or against the proposition that two letters received at the same time, from the same

16    source, and via the same postal service, but arriving in separate envelopes, are "received

17    separately."  More persuasive is the textual evidence Dolby adduces, which shows that the '157

18    Patent anticipates delivery of information via separate "containers" or packages.  That patent's

19    specification, for example, includes an illustration and an accompanying explanation stating that a

20    "rule and control information may be specified entirely in [a single] container . . . and/or may be

21    delivered . . . as part of another container," *e.g.*, "a separately deliverable container."

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

United States District Court
Northern District of California

14



FIG. 73

execution for example. This rule and control information may be specified entirely in container 300z, and/or may be delivered as part of container 300, as part of another container (either within container 300 or a separately deliverable container), and/or may be already present at the remote VDE site.

Docket No. 124 ("Demonstratives") at 9 (quoting '157 Patent at 236:32-36); *see also* '157 Patent at 17:21-26 (stating that electronic content and control information may be packaged in "the same VDE container, and/or may involve the delivery . . . in plural separate VDE content containers and/or employing plural different delivery means"). Especially since both parties agree that the claim terms should be construed according to their plain and ordinary meaning, *see* Responsive Br. at 2, Reply Br. at 2, the Court finds that the receipt of electronic content and control information in separate containers or packages, as the '157 Patent contemplates, amounts to "receiving" such data "separately."

This conclusion is further supported by Intertrust's assertion, at the hearing, that sending information "from the same source, [at] the same time, [and along the] same path but in a different container" would add "an extra level of protection" to the transmission, in much the same way that sending it "over a different path" also would. *See* Hearing Tr. at 18-19. This acknowledgment suggests that there is a functional difference between otherwise unitary groups of data (sent from the same source, at the same time, and along the same path) that are sent in a single package versus multiple packages, and that the latter scenario thus amounts to separate receipt of the data. And the Court's construction here harmonizes with the one it adopts with respect to the closely related "receiving . . . separately . . . and via separate delivery" term below.

1    The Court therefore construes the claim terms "receiving . . . separately" and "receiving,

2 separately" to mean "receiving in a different package and/or via delivery at a different time, over a

3 different path, or from a different source," as Dolby proposes.

4         3.    "receiv[ed/ing] . . . separately . . . and via separate delivery" & receiving . . .

5               independently . . . via separate delivery"

6

| Claim Term | Claim(s) | Intertrust's Proposed Construction | Dolby's Proposed Construction | Court's Construction |
|---|---|---|---|---|
| "receiv[ed/ing] . . . separately . . . and via separate delivery" / "receiving . . . independently . . . via separate delivery" | '157 Patent (claims 53, 69, 86)  '158 Patent (claim 4) | "receiv[ed/ing] through a different path" | "receiving via delivery at a different time, over a different path, or from a different source" | "receiving via delivery at a different time, over a different path, or from a different source" |

19

20    Claim 69 of the '157 Patent, one of the claims in which the contested terms are found,

21 recites "[a] method performed by an electronic appliance comprising a processor and a memory

22 encoded with program instructions that, when executed by the processor, cause the electronic

23 appliance to perform the method." '157 Patent at Clm. 69.  The steps comprising the method

24 include:

25         • **receiving**, by the electronic appliance, **separately** from the first piece of electronic

26             content, **and via separate delivery**, a first electronic object, the first electronic

27             object specifying one or more permitted or prohibited uses of the first piece of

28             electronic content.

United States District Court
Northern District of California

1    *Id.*  Similarly, Claim 4 of the '158 Patent recites "[a] method utilizing an electronic appliance

2    comprising a processor and a memory encoded with program instructions that, when executed by

3    the processor, cause the processor to perform the method."  '158 Patent at Clm. 4.  The steps

4    comprising this method include:

- **receiving**, at the electronic appliance, **independently** from the electronic content

  item **via separate delivery** and protected separately from the electronic content

  item, a rule specifying one or more permitted uses of the electronic content item.

8    *Id.*

9         Intertrust again proposes the construction that the parties in *Cinemark* agreed to.  *See*

10   Opening Br. at 5, Tex. Agreed Terms at 13-18.  Dolby, meanwhile, suggests substantially the

11   same construction that Intertrust proposed for the previous claim term, *i.e.*, "receiving . . .

12   separately."  The parties agree that "that the 'separate delivery' term is the result of a disclaimer

13   adopted to overcome prior art rejections during prosecution of the '157 and '158 Patents."

14   Responsive Br. at 4.  They also agree, as mentioned above, that this disclaimer was meant to

15   "narrow [the claims'] scope" from the overly "broad" construction given the patents by the PTO

16   Examiner when they recited only "receiving . . . separately" or "receiving . . . independently" but

17   not "via separate delivery."  *See* Opening Br. at 6-7.  The parties disagree, however, about the

18   implications of the prosecution history for construing these terms.

19         Intertrust explains that during prosecution the original wording of what are now claims 53,

20   69, and 86 of the '157 Patent, "receiving, separately from the . . . content, a first electronic object

21   specifying one or more permitted or prohibited uses of the . . . content," was rejected as

22   anticipated by prior art.  *Id.* at 5-6 (quoting Docket No. 107-10 at 10-17).  The Examiner

23   concluded that the claims' "receiving . . . separately" language failed to capture "the ***implicitly***

24   alleged limitation 'the electronic rule and electronic content are <u>transmitted via two independent</u>

25   <u>(or separate) *paths*</u>.'"  *Id.* at 6 (quoting Docket No. 107-11 at 2-3).  In response, "the Applicant

26   amended the claims to further recite 'receiving . . . separately from the . . . content, <u>and via</u>

27   <u>separate delivery</u>, a first electronic object . . . ,' after which the Examiner promptly allowed the

28   claims."  *Id.* (citing Docket No. 107-13 at 11-19; Docket No. 107-14).  A similar amendment

United States District Court
Northern District of California

17

1    process occurred with respect to the '158 Patent, which originally recited "that the claimed rule

2    was 'receiv[ed] . . . independently' from the content." *Id.* In that case, the same Examiner again

3    found that "the ***implicitly*** alleged limitation . . . 'the electronic rule and electronic content are

4    ***transmitted via two independent (or separate) paths***' (or ***not transmitted within the same***

5    ***package at one time***' has not been recited into the claim." *Id.* (quoting Docket No. 107-15 at 3).

6    Intertrust once more amended the claim to add "via separate delivery" to the previously proposed

7    "receiving . . . independently" language, and the claim was allowed. *See id.* (citing Docket No.

8    107-16 at 006-008). To Intertrust, the claims' "via separate delivery" language is directly

9    responsive—and so functionally equivalent—to the Examiner's stated interpretation of the claims'

10   implied limitation, "independent (or separate) paths."

11          To Dolby, this prosecution history shows instead that Intertrust chose *not* to adopt the

12   examiner's suggested construction, as "the 'via separate delivery' language ***actually***

13   ***claimed*** . . . in the patent" differs from the examiner's "via two independent (or separate) paths."

14   Responsive Br. at 4; *see also Howmedica Osteonics Corp. v. Wright Med. Tech Inc.*, 540 F.3d

15   1337, 1344 (Fed. Cir. 2008) (noting that "if the patentee had intended" a particular limitation to

16   exist "he could have drafted [the claim] to require that" limitation). Dolby also points to

17   statements from the '158 Patent file history, where the amendment Intertrust ultimately adopted

18   was described as "***a common agreement*** . . . ***for allowance***" between the Examiner and the

19   patentee—*i.e.*, the result of a negotiation between the two and not merely a borrowing by the

20   patentee from the Examiner. Responsive Br. at 5 (quoting Docket No. 107-16 at 10); *see also*

21   Reply at 3-4 (describing the same process). Dolby further observes that Intertrust "d[id] not

22   concede" that the Examiner's interpretation of the prior art scope was correct when it sought

23   allowance for the amended claim language featuring "via separate delivery." Demonstratives at

24   14 (quoting Docket No. 107-13 at 24-25). This somewhat opaque prosecution history is

25   important, Dolby stresses, because the Federal Circuit has held that it is only when a patentee

26   "makes clear and unmistakable prosecution arguments limiting the meaning of a claim term in

27   order to overcome a rejection" that "courts limit the relevant claim term to exclude the disclaimed

28   matter." *Id.* at 13 (quoting *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed.

United States District Court
Northern District of California

18

1    Cir. 2005)).  Where a patentee's disclaimer during the prosecution history is "ambiguous," in

2    contrast, a "court will not use [the disclaimer] to limit a claim term's ordinary meaning."  *Id.*

3    (citing *SanDisk*, 415 F.3d at 1287.  Dolby then argues, as described above, that the '157 Patent

4    itself defines "separate delivery" when it states that, through the invention, information may be

5    "delivered separately (e.g., at a different time, over a different path, and/or by a different party."

6    *Id.* at 12 (quoting '157 Patent at 127:24-27); *see also* Opening Br. at 4 (quoting the same passage).

7          The Court again agrees with Dolby, as its proposed construction has the virtue of being

8    rooted in "the actual claim language adopted by the patentee."  *See* Responsive Br. at 4; *see also*

9    *Innova/Pure Water*, 381 F.3d at 1115 (affirming that "the claims of a patent define the invention").

10   Again, the '157 Patent expressly identifies "separate delivery" with delivery "at a different time,

11   over a different path, and/or by a different party," '157 Patent at 127:24-27, an identification that

12   Intertrust also acknowledged in its discussion of the "receiving . . . separately" claim terms.  *See*

13   Opening Br. at 4.  This explicit claim language sets a high bar for Intertrust to clear in arguing for

14   an alternative construction, and it fails to do so here.  As with the previous claim terms, the

15   defendants' stipulation in *Cinemark* to the construction Intertrust proposes is mostly irrelevant

16   here, as the court in that case did not offer any analysis of the issue beyond accepting the parties'

17   proposal.  *See* Tex. Agreed Terms at 13-18.  And while Intertrust is correct that "statements by an

18   examiner that shed light on the examiner's understanding of the claim scope are probative in

19   determining the proper scope of [a] claim," Reply at 4 (citing *Ventana Med. Sys., Inc. v. Biogenex*

20   *Labs., Inc.*, 473 F.3d 1173, 1182-83 (Fed. Cir. 2006)), the Examiner here did not unmistakably

21   equate the addition of the phrase "via separate delivery' with "via two independent (or separate)

22   paths," as Intertrust suggests.  Moreover, Intertrust did not incorporate language otherwise

23   adopting the Examiner's position."  Taken alongside Intertrust's refusal to concede the propriety

24   of the Examiner's findings during prosecution, this ambiguity does not satisfy the Federal

25   Circuit's requirement that a patentee "make[ ] clear and unmistakable prosecution arguments

26   limiting the meaning of a claim term in order to . . . exclude the disclaimed matter."  *See SanDisk*

27   *Corp.*, 415 F.3d at 1286.

28          The Court therefore construes the claim terms "receiv[ed/ing] . . . separately . . . and via

United States District Court
Northern District of California

separate delivery" and "receiving . . . independently . . . via separate delivery" to mean "receiving via delivery at a different time, over a different path, or from a different source," as Dolby proposes.

4. "secure processing unit"

| Claim Term | Claim(s) | Intertrust's Proposal | Dolby's Proposal | Court's Construction |
|---|---|---|---|---|
| "secure processing unit" | '157 Patent (claims 69, 87, 89)  '158 Patent (claim 4) | "processing unit that makes information and processes resistant to unauthorized use" | "processing circuitry that functions in a self-contained, trusted computing environment" | "processing unit that makes information and processes resistant to unauthorized use" |

Claim 69 of the '157 Patent, a representative claim in which the disputed term is found, recites "[a] method performed by an electronic appliance comprising a processor and a memory encoded with program instructions that, when executed by the processor, cause the electronic appliance to perform the method." '157 Patent at Clm. 69. The steps comprising the method include:

- decrypting, by the electronic appliance, the first key using (a) a second key and (b) a **secure processing unit** running on the electronic appliance, the second key being stored in memory of the **secure processing unit**.

*Id.* Additionally, Claim 4 of the '158 Patent recites "[a] method utilizing an electronic appliance comprising a processor and a memory encoded with program instructions that, when executed by the processor, cause the processor to perform the method." '158 Patent at Clm. 4. The steps comprising the method include:

United States District Court
Northern District of California

1      • using, at least in part, a decryption key to decrypt the electronic content item, the

2         decryption key being stored in a **secure processing unit** contained in the electronic

3         appliance.

4    *Id.*

5         The issue here concerns the scope of the secure processing unit ("SPU"), namely whether

6    the SPU must take the form of the "special purpose hardware" that is shown in certain figures of

7    the applicable patents' specifications.  *See* Hearing Tr. at 35-36.

8         Intertrust again proposes the construction that the *Cinemark* court adopted (this time after

9    the parties litigated the issue), while Dolby suggests the same interpretation as the defendants in

10   that case, which the court declined to adopt.  *See* Opening Br. at 7, *Cinemark* at 12-17.  Intertrust's

11   basic point is that the SPUs described in the relevant claims "may take many different forms,"

12   including various types of hardware or software embodiments.  Opening Br. at 7; *see also, e.g.*,

13   '157 Patent at 20:48-54 (providing that the SPU may be a "special purpose processor," or

14   hardware); *id.* at 44:57-61 (providing that the SPU can be "emulated in software").  An SPU is

15   simply technology that "protects against tampering" or "unauthorized observation."  Hearing Tr. at

16   36.  Dolby's more restrictive construction, however, "improperly excludes preferred

17   embodiments" of the invention.[9]  Reply at 5-6.  In sum, Intertrust faults Dolby's proposal for

18   simply not being "broad enough to cover every disclosed embodiment of an SPU."  *Id.* at 6.

19   Intertrust also contends that Dolby's construction is "overly confusing" because it fails to explain

20   what it "means for 'processing circuitry' (physical hardware) to 'function[] in a self-contained,

21   trusted computing environment,'" which is merely "a logical construct referring to the capabilities

22   available to a software program."  *Id.*

23        Dolby counters that the '157 Patent does not "disclose or claim the SPU as software," but

24   only as hardware.  *See* Responsive Br. at 7.  The specification merely mentions "emulating an

25

26   _____

27   [9] For example, the '157 Patent's specification discloses "that a secure processing environment
     (SPE) is a 'self-contained computing . . . environment[]' that may be '*loadable into* . . . [an]
     SPU[]."  Opening Br. at 8 (quoting '157 Patent at 77:52-78:3).  Dolby's proposal, however,

28   requires the SPU to "function[] in" a "self-contained, trusted computing environment," *i.e.*, an
     SPE.  *See id.*

United States District Court
Northern District of California

1   SPU in software," which is not the same thing as disclosing an SPU that is itself software.  *Id.* at 6;

2   *see also* '157 Patent at 44:57-61 (providing that the "SPU is emulated in software").[10]  Moreover,

3   the '157 Patent consistently refers to hardware that requires such features as "processing

4   circuitry," "a microprocessor," and "memory."  Hearing Tr. at 40-41.  Dolby thus proposes the

5   term "processing circuity" to encompass these mandatory hardware characteristics.  It also defends

6   its proposition that the SPU hardware operates within "a self-contained, trusted computing

7   environment" by citing figures 6 and 9 in the '157 Patent's specification, which situate the SPU

8   inside a "tamper-resistant barrier."  *See id.* (quoting '157 Patent at Figs. 6, 9).  Dolby's use of

9   "self-contained" and "trusted" is thus meant to capture the "notion that the [tamper-resistant]

10   barrier is an enclosure."  *Id.* at 43-44.

11         As with this case's first set of disputed terms, the *Cinemark* court staked out something of

12   a middle ground between the constructions of an SPU proposed by the parties there.  The court

13   found that "secure" in the '157 and '158 Patents "refers to resistance to unauthorized use of

14   information and processes."  *Cinemark* at 14.  Beyond this, the court observed that the relevant

15   claims "provide little guidance as to the meaning of 'secure processing unit,'" but concluded that

16   they "primarily situate the 'secure processing unit' within the claimed invention" as hardware.  *Id.*

17   at 14-15.  At the same time, the claims also explain "that the SPU may be implemented in

18   software."  *Id.* at 16.  Thus, while the hardware-focused construction that Dolby here urges is

19   accurate as to many of the patents' preferred embodiments, the *Cinemark* court held that "the

20   defining nature of the SPU is that it protects information and processes against unauthorized use

21   such as tampering and unauthorized viewing."  *Id.* at 17; *see also* '157 Patent at 20:24-34 (stating

22   that the SPU "protect[s] against tampering with, or unauthorized observation of, information and

23   functions").

24

25   [10] Regarding this issue, Dolby offers the example of a PC computer running a Windows operating
     system that also has Apple emulation software installed on it: the emulation software endows the
26   PC "with certain Apple functionality," but "one would not refer to the PC device as now being an
     Apple device."  Responsive Br. at 6.  "Likewise, an emulation of an SPU can function *like* a true
27   SPU, but that does not convert the emulation into an ***actual*** SPU."  *Id.*  For its part, Intertrust
     acknowledged at the hearing that an SPU cannot be "purely software" and that it must include at
28   least some hardware.  Hearing Tr. at 35.

1    Given the "reasoned deference" that the *Cinemark* court is owed, *see* Reply at 1, this Court

2    presumes that the earlier construction is proper unless Dolby offers "a strong reason" not to, *see*

3    *TQP Dev.*, 2014 WL 2810016 at *6.  Dolby has not done so here.  Most problematically, its

4    proposed construction contains numerous terms—"processing circuity," "self-contained," and

5    "trusted"—that are not found in the language of the applicable patents themselves.  Dolby's

6    proposal is therefore linguistically imprecise.  It also appears to be conceptually imprecise, as

7    Dolby argued at the hearing both that the SPU must be hardware *and* that "[t]he SPU operates

8    within" a secure processing environment, which can evidently take the form of software.  *See*

9    Demonstratives at 22, 24.  As Intertrust argued during the hearing, it is not clear how "circuitry

10   can function *in* software."  Hearing Tr. at 45 (emphasis added).  Intertrust's proposed construction,

11   meanwhile, is far better than Dolby's at accommodating the many exemplary embodiments

12   described in the patents' specifications.  *See Verizon*, 503 F.3d at 1305 (stating that courts

13   "normally do not interpret claim terms in a way that excludes disclosed examples in the

14   specification").  And Intertrust's proposal has the virtue of simplicity, defining the claim term as a

15   commonplace "processing unit" that delivers a heightened level of security, *i.e.*, "resistance to

16   unauthorized use of information and processes."[11]  *See Cinemark* at 14.

17       The Court therefore construes the claim term "secure processing unit" to mean "processing

18   unit that makes information and processes resistant to unauthorized use," as Intertrust proposes.

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26

27

28   ───────────────
     [11] As Intertrust explained at the hearing, "[p]rocessing units are well-known components,"
     contained "in every single computer" and including such devices as a CPU.  Hearing Tr. at 35-36.

United States District Court
Northern District of California

5. <u>"rendering application" / "application program capable of rendering electronic content"</u>

| Claim Term | Claim(s) | Intertrust's Proposed Construction | Dolby's Proposed Construction | Court's Construction |
|---|---|---|---|---|
| "rendering application" / "application program capable of rendering electronic content" | '106 Patent (claim 17)<br><br>'342 Patent (claims 1, 12) | "application program that processes content to play it through an audio output (*e.g.*, speakers) or display it on a video output (*e.g.*, a screen)" | "software program that presents electronic content in a form designed for human perception or viewing" | "application program that processes content to present it through an audio output (*e.g.*, speakers) or display it on a video output (*e.g.*, a screen)" |

Claim 17 of the '106 Patent recites "[a] method for managing the use of electronic content at a computing device." '106 Patent at Clm. 17. The steps comprising the method include:

- executing a **rendering application** on the computing device, the **rendering application** being associated with at least the first digital certificate, the first digital certificate having been generated by a first entity based at least in part on a determination that the **rendering application** will handle electronic content with at least a predefined level of security;

- requesting, through a rights management engine executing on the computing device, permission for the **rendering application** to render the piece of electronic content.

24

1   *Id.*  Claim 1 of the '342 Patent, a representative claim in which the disputed term is found,

2   similarly recites "[a] method for managing the use of electronic content at a user's computing

3   device."  '342 Patent at Clm. 1.  The steps comprising the method include:

4   • executing an application program on the user's computing device, the **application**

5   **program being capable of rendering electronic content**, the application program

6   having at least a first digital certificate associated therewith . . . .

7   *Id.*

8   The issue here is whether "rendering application" encompasses the *processing* of

9   electronic (or audiovisual) content in addition to the *presentation* (or playing) of that content.  *See*

10   Hearing Tr. at 37.  Intertrust argues that the Court's construction must account for the processing

11   of content, while Dolby argues that it need only capture presentation.

12   Intertrust once more proposes the construction adopted in *Cinemark* after the parties in that

13   case litigated the issue.  *See* Opening Br. at 9, *Cinemark* at 49.  As with other disputed claim

14   terms, the *Cinemark* court settled on a compromise interpretation, concluding (based on the '106

15   Patent in particular) that "the defining characteristic of the 'rendering application'" is "rendering"

16   or "presenting" content, but that the application "*may* have functionality beyond rendering."

17   *Cinemark* at 47-48.  The court also found that "the 'presenting' that the 'rendering application'

18   effects includes both audio (e.g., music players) and images (e.g., document editors)."[12]  *Id.*  The

19   court thus endorsed Intertrust's argument that a rendering application not only "plays" but may

20   also "process[]" content, while also agreeing with defendants' position there (and Dolby's here)

21   that the term applies primarily to presenting audio and visual outputs.  *See id.* at 45.

22   In support of the *Cinemark* decision, Intertrust cites various examples from the '106 Patent

23   where the specification "states that a rendering application . . . processes content" and "describes

24   various ways [that] rendering applications process content, such as by accessing, using, moving, or

25   otherwise manipulating the content."[13]  Opening Br. at 9; *see, e.g.*, '106 Patent at 10:8-11

26

27   [12] The court derived its construction in part from this District's ruling in the related *Microsoft* case.
     *See Cinemark* at 48-49.

28   [13] Intertrust argued at the hearing that whereas Dolby conceives of the rendering application as

United States District Court
Northern District of California

1    (describing how rendering "applications [may] be operable to retrieve . . . instructions and use

2    them to process . . . protected content"); *id.* at 17:5-11 (stating that "the rendering application"

3    may be "capable of applying policies, rules, and/or controls to govern the use of content or the

4    performance of events").  Intertrust also argues that a person of ordinary skill in the art

5    ("POSITA") "would have understood" that the '106 Patent's "numerous examples of rendering

6    applications . . . *process* content prior to or during presentation by accessing and interpreting the

7    content, applying rules and controls to govern use," and so on.  Opening Br. at 10.  Intertrust

8    contends that Dolby's construction, in contrast, "arguably only covers the final transmission of

9    content, and excludes all other tasks that must take place before that transmission can occur."  *Id.*

10    Dolby insists that a rendering application must "actually perform the central function of

11    *rendering.*"  Responsive Br. at 9.  It argues that Intertrust impermissibly seeks to enlarge the scope

12    of the applicable patents to encompasses an application that "'processes' the content in any

13    manner before final transmission."  *Id.*  Such a broad interpretation is unwarranted, Dolby asserts,

14    because the pre-presentation processes that Intertrust says a POSITA would have associated with a

15    rendering application are typically performed, per the relevant claim language, by a rights

16    management engine.  *Id.* at 10; *see, e.g.*, '106 Patent at Clm. 17 (reciting "requesting, through a

17    rights management engine," permission to render content); '342 Patent at Clm. 1 (reciting "using a

18    rights management program . . . to examine the data").  "In any event," Dolby avers, its proposed

19    "construction does not preclude [the] processing" functions that Intertrust claims since those

20    "capabilities are encompassed in 'present[ing] electronic content in a form designed for human

21    perception or viewing."  *Id.* at 10 n.5.

22    As before, the Court accords "substantial weight" to the *Cinemark* court's construction, *see*

23    *TPQ Dev.*, 2014 WL 2810016 at *6, which borrowed from both parties' proposals in that case and

24    drew on this District's *Microsoft* decision involving related patents.  Focusing on the specification

25    of the '106 Patent, the *Cinemark* court found both that "the 'rendering application' *may* have

26    _____

27    "only the device . . . that is going to show content for human perception," the patents indicate that
     they include such varied technology as "document editors or viewers, electronic book readers,
28    video players, music players, electronic mail or messaging programs[,] or the like."  Hearing Tr. at
     47-48.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   functionality beyond rendering (presenting)" and "that 'rendering' is the defining characteristic of

2   the 'rendering application.'"  *Cinemark* at 48 (discussing '106 Patent at 16:67-17:11).  It therefore

3   tailored a construction—"application program that processes content to play it through an audio

4   output (e.g., speakers) or display it on a video output (e.g., a screen)," *id.* at 49—that incorporated

5   the rendering application's capacity for processing content (*e.g.*, by "applying policies, rules,

6   and/or controls to govern the use of content," '106 Patent at 17:7-8) as well as its primary function

7   in presenting content.

8          This Court agrees with the substance of that decision.  Intertrust has demonstrated that the

9   relevant patents disclose many "processes" performed by the rendering application that go beyond

10  the mere end-stage presentation of audiovisual content.  This conclusion is not contradicted by

11  Dolby's arguments about the role of the rights management program in processing content.  As

12  Intertrust puts it, "[j]ust because a rights management program may perform *some* of the rendering

13  application's processing functions does not mean that the rendering application does not perform

14  *any* of them."  Reply at 7 (emphasis added).  And while Dolby is correct in arguing that the

15  Court's construction should not encompass content processing that only *potentially* relates to

16  presentation, *see* Hearing Tr. at 53-54, the Court is satisfied that the *Cinemark* construction

17  effectively limits content processing to that which is necessary for, and inextricably linked with,

18  eventual presentation.

19         The Court concludes, however, that insofar as Dolby's preferred term "present" has special

20  meaning in the applicable patents that the *Cinemark* construction's "play" might fail to fully

21  capture, it is proper to substitute the former for the latter.  Doing so reinforces Dolby's point,

22  which the *Cinemark* court also recognized, that the rendering application's "defining

23  characteristic" is its presentation of audiovisual content.  *See* Responsive Br. at 9-10, *Cinemark* at

24  48.

25         The Court therefore construes the claim terms "rendering application" and "application

26  program capable of rendering electronic content" to mean "application program that processes

27  content to present it through an audio output (*e.g.*, speakers) or display it on a video output (*e.g.*, a

28  screen)."

6. "wherein the piece of electronic content comprises an authorizing document . . ."

| Claim Term | Claim(s) | Intertrust's Proposed Construction | Dolby's Proposed Construction | Court's Construction |
|---|---|---|---|---|
| "wherein the piece of electronic content comprises an authorizing document, and the second entity associates the second digital certificate with the authorizing document if the authorizing document originated from a certified entity" | '342 Patent (claim 1) | Clause is limiting, but does not add an additional step performed by a second entity | The claimed method includes an action ("associates . . .") to be performed by the second entity | The claimed method includes an action ("associates . . .") to be performed by the second entity |

Claim 1 of the '342 Patent, as described above, recites "[a] method for managing the use of electronic content at a user's computing device."  342 Patent at Clm. 1.  The claim discloses six steps that comprise the method.  The full claim is quoted below (with the disputed term bolded), as the claim's organization is crucial to the parties' arguments.

>    **1.** A method for managing the use of electronic content at a user's computing device, the method including:
>
>    executing an application program on the user's computing device, the application program being capable of rendering electronic content, the application program having at least a first digital certificate associated therewith, the first digital certificate being generated by or on behalf of a first entity comprising an association of one or more content providers, the first digital certificate being associated with the application program if the application program meets certain predefined criteria set by the association, the

28

predetermined criteria including that the application program will handle the electronic content with at least a predefined level of security;

requesting the application program to render a piece of electronic content, the piece of electronic content having at least a second digital certificate associated therewith, the second digital certificate being generated by or on behalf of a second entity different from the first entity, and the piece of electronic content further having associated therewith at least one electronic rule, the at least one electronic rule including data specifying one or more conditions associated with rendering the piece of electronic content, the one or more conditions including a condition that the piece of electronic content may be rendered by an application program having the first digital certificate associated therewith;

verifying, at the user's computing device, the association of the second digital certificate with the piece of electronic content;

using a rights management program running on the user's computing device to examine the data included in the at least one electronic rule and to determine that the piece of electronic content may be rendered by an application program having the first digital certificate associated therewith;

verifying the association of the first digital certificate with the application program using the rights management program; and

rendering the piece of electronic content using the application program, **wherein the piece of electronic content comprises an authorizing document, and the second entity associates the second digital certificate with the authorizing document if the authorizing document originated from a certified entity.**

*Id.*

Intertrust argues that the contested "wherein" clause "recites a claim element ('associates') that the second entity satisfies elsewhere and in advance of the user's computing device rendering the piece of electronic content."  Reply at 7.  The clause thus contributes to "the *preexisting environment* in which the claim steps are performed," and does not refer to a separate step that the second entity undertakes.  *Id.* (emphasis added).  Intertrust asserts that because Claim 1 "is expressly limited to 'managing the use of electronic content *at a user's computing device*' . . . all six of the recited claim steps are performed at, on, and/or by the user's computing device (not elsewhere by a second entity)."  Opening Br. at 11.  In other words, "the 'wherein' clause does not impose an additional claim step performed elsewhere by a second entity," which Intertrust believes would be inconsistent with the other claim steps, but is merely "a prerequisite for

performance of" those steps. *Id.* at 12.  More specifically, the "wherein" clause "requires that the 'piece of electronic content' recited earlier in the claim [at step 2] must 'comprise[] an authorizing document,' and that the 'second digital certificate'—described earlier in the claim [also at step 2] as 'generated by or on behalf of a second entity' and 'associated [with the piece of electronic content]'—is associated with the content's authorizing document by the second entity." *Id.* (quoting '342 Patent at Clm. 1).  In support of this argument, Intertrust also emphasizes the "grammar and indentation of the claim," where "the six claim steps . . . 'each start on a separate line with a gerund, a verb that acts as a noun, demonstrating how the method should be performed.'" *Id.* (quoting *Core Wireless Licensing S.A.R.L. v. Apple Inc.*, 2016 WL 6427850, at *5 (N.D. Cal. Oct 31, 2016)).  "In contrast, the 'wherein' clause is 'contained within the indentation for [the claim's 'rendering' step] and do[es] not begin with a gerund.'" *Id.* at 11-12 (quoting *Core Wireless*, 2016 WL 6427850 at *5).

Dolby counters that "the grammar and context of the claim" prove that the "wherein" clause "recites an action to be performed," "not a mere prerequisite for performing certain actions."  Responsive Br. at 11.  Dolby divides step 6 of Claim 1 into three parts, the first beginning "rendering the piece . . . ," the second beginning "wherein the piece . . . ," and the third beginning "and the second entity associates . . . ."  *Id.* at 11-12.  The third part "is a separate independent clause composed of a subject ('the second entity'), an action verb ('associates'), and an object of that action verb ('the second digital certificate')."  *Id.* at 12.  This syntax proves to Dolby that the limitation "requires the second entity to perform the 'associates' step."  *Id.* at 11.  Dolby also cites authority from the Federal Circuit and elsewhere holding that a clause may "require a second method step" even when introduced by "wherein."  *See id.* at 12 (citing, *e.g.*, *Desenberg v. Google, Inc.*, 392 Fed. Appx. 868, 871 (Fed. Cir. 2010)).  Dolby concludes by distinguishing the instant case from *Core Wireless*, where "the claim language, specification, and expert testimony all demonstrated that the wherein clauses at issue described the configuration of a radio network and not method steps to be performed by that network."  *Id.* at 13; *see also Core Wireless*, 2016 WL 6427850 at *3-5.  Here, in contrast, "the focus of the invention . . . is on the entire process for managing use of content and includes necessary steps performed by entities

other than the user's computer."  Responsive Br. at 13.

The Court adopts Dolby's proposed construction.  While both parties' arguments are at times abstruse, Intertrust's key contention that the "wherein" clause in step 6 of Claim 1 refers to and limits language in step 2 is implausible.  As described above, Claim 1 mentions a "second digital certificate" and "second entity" in its second step, beginning "requesting the application program to render a piece of electronic content . . . ."  '342 Patent at Clm. 1.  Step 2 states that the application program receives a request "to render a piece of electronic content, the piece of electronic content having at least a second digital certificate associated therewith, the second digital certificate being generated by or on behalf of a second entity different from the first entity." *Id.*  Then, at step 3, "the association of the second digital certificate with the piece of electronic content" is verified.  *Id.*  And at step 6, "the second entity associates the second digital certificate with the authorizing document" that is comprised of "the piece of electronic content." *Id.*  This sequence appears to indicate that the second entity's association of the second digital certificate with the authorizing document has not previously been recited.  It is therefore hard to understand how, as Intertrust argues, the second entity satisfies the "associates" claim element "*elsewhere and in advance* of the user's computing device rendering the piece of electronic content." *See* Reply at 7 (emphasis added).

The organizational logic of Intertrust's proposed construction is likewise difficult to fathom.  As Dolby observed at the hearing, Intertrust is "asking the Court . . . to take [the "wherein"] clause . . . and move it up to three limitations earlier" in the claim.  Hearing Tr. at 64.  Even if the '342 Patent does not provide a model of claim-drafting clarity, the structure that Intertrust posits here defies common sense.  Moreover, the Court finds it significant that, as Dolby stresses, the clause beginning "and the second entity" is written in the present, not past, tense and employs an active verb: "the second entity associates the second digital certificate with the authorizing document . . . ."  Tellingly, Intertrust is forced to revise the clause's grammar in arguing that the "wherein" clause "do[es] not impose an additional claim step," stating that "the 'second digital certificate' . . . *is associated with* the content's authorizing document by the second entity." *See* Opening Br. at 12 (emphasis added).  While such a passive construction might

31

United States District Court
Northern District of California

1    support Intertrust's contention that the "wherein" clause is merely "a prerequisite for performance

2    of the recited claim steps," *id.*, the active construction does not.  Rather, the grammar of the clause

3    suggests that it "recites an action to be performed as part of the claimed 'method for managing the

4    use of electronic content.'"  Responsive Br. at 11.

5           The Court therefore construes the claim term "wherein the piece of electronic content

6    comprises an authorizing document, and the second entity associates the second digital certificate

7    with the authorizing document if the authorizing document originated from a certified entity" to

8    refer to "an action ("associates . . .") to be performed by the second entity," as Dolby proposes.

9           7.    "the user"

| Claim Term | Claim(s) | Intertrust's Proposal | Dolby's Proposal | Court's Construction |
|---|---|---|---|---|
| "the user" | '721 (claims 9 and 29) | plain and ordinary meaning | indefinite | "the person or entity using an electronic appliance" |

19          Claim 9 of the '721 Patent recites "[a] method of distinguishing between trusted and

20   untrusted load modules."  '721 Patent at Clm. 9.  The steps comprising the method include:

21                 (a) receiving a load module,

22                 (b) determining whether the load module has an associated digital
                   signature,

23

24                 (c) if the load module has an associated digital signature,
                   authenticating the digital signature using at least one public key
                   secured behind a tamper resistant barrier and therefore hidden from
25                 **the user**; and

26                 (d) conditionally executing the load module based at least in part on
                   the results of authenticating step (c).
27

28   *Id.*  Claim 29 of the same patent recites "[a] method of distinguishing between trusted and

32

untrusted executables." *Id.* at Clm. 29.  The steps comprising the method are identical to those in Claim 9, except that "executable" is substituted for "load module."  *See id.*

The issue here is whether the '721 Patent defines "the user" with sufficient specificity so that a POSITA could discern the term's meaning and, as a result, the scope of the invention. Intertrust argues that the claims and specification of the patent make clear "that 'the user' refers to the user of the computing system that is the subject of the claims."  Opening Br. at 12.  Dolby counters that, because the claims "recite no antecedent basis for 'the user'" and otherwise "fail to provide reasonable notice of the scope of the claimed invention," the claims fail for indefiniteness. Responsive Br. at 14.

"[I]ndefiniteness is a question of law and in effect part of claim construction."  *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).  Under § 112 of the Patent Act, patent claims must particularly point out and distinctly claim the subject matter of the invention. 35 U.S.C. § 112.  A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  If it does not, then the claim fails § 112 and is invalid as indefinite.  *See id.* at 901.  Whether a claim is indefinite is determined from the perspective of a POSITA at the time the application for the patent was filed.  *Id.* at 911.  As a charge of indefiniteness is a challenge to the validity of a patent, the failure of any claim-in-suit to comply with § 112 must be shown by clear and convincing evidence.  *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

Intertrust points to numerous passages in the '721 Patent's specification that mention a "user" and so provide an antecedent definition for the claim language.  For example, the specification "warns that 'introducing a bogus load module is one of the strongest possible forms of attack (by a protected processing environment *user* or anyone else),' and touts Intertrust's techniques for 'securing protected processing environments against inauthentic load modules introduced by *the computer owner, user,* or any other party."  Opening Br. at 13 (quoting '721 Patent at 2:66-3:9, 4:1-26).  Intertrust also points to language in the specification that refers to "the significant threat that the owner of [a] protected processing environment . . . may himself attack

United States District Court
Northern District of California

1    the environment." *Id.* (quoting '721 Patent at 14:23-38).  It then introduces testimony from its

2    expert, Dr. Jakobsson, arguing that "a POSITA would understand that any threat posed by the

3    owner of a protected processing environment could also be posed by a user of a computer." *Id.*

4    (quoting Docket No. 80-3 ("Jakobsson Decl.") ¶ 49).  Intertrust thus contends that "the user" in the

5    '721 Patent bears a plain and ordinary meaning in which, for example, a computer user and owner

6    may in some instances be one and the same and in other instances not.  In its reply, however,

7    Intertrust also suggests its amenability to more limited constructions of the claim term, such as the

8    user of "a computer or other electronic system," of "an electronic appliance" that is "part of a

9    computing system," or of "a computer system."  *See* Reply at 9.

10           Dolby counters that "the claims do not recite a 'computing system'" since, according to its

11   expert, Dr. Chatterjee, they fail to "specify any 'particular device, machine, portion(s) of a device,

12   software or person that is involved with performing any of the steps.'"  Responsive Br. at 14

13   (quoting Docket No. 80-4 ("Chatterjee Decl.") ¶ 31).  As a result, "a POSITA would be unable to

14   determine with reasonable certainty whether 'the user' refers to a user of the claimed method (or a

15   portion thereof . . .), a user of the claimed 'load module' (claim 9) or the claimed 'executable'

16   (claim 29), or both." *Id.* (citing Chatterjee Decl. ¶¶ 30-38).  Dolby then identifies multiple

17   references to different kinds of "users" in the '721 Patent's specification, which it argues render

18   the claims' scope uncertain.[14]  Dolby also argues that Intertrust's suggestions in its briefing that

19   "the claimed 'the user' includes 'the protected processing environment *user*,' '*owner*' of protected

20   processing environment,' '*user* of a computer,' '*computer owner*,' [or] user of a 'computer

21   system' or 'other electronic system'" further highlights the indeterminacy of the term.  *Id.* at 16

22   (quoting Opening Br. at 14-15).  Dolby lastly points out that "the only claim language that could

23   arguably provide any implied antecedent basis" for "user"—"authenticating the digital signature

24   *using* at least one public key"—only enhances the confusion, as "public key" is in part defined by

25   its being "hidden from the user." *Id.* at 17 (quoting '721 Patent at Clms. 9 and 29).  Dolby thus

26

27   ─────────────────────
     [14] The specification, for instance, alternatively mentions "user[s] of executables," "potential users
28   of the load module," "ultimate users," and "a network of users." *Id.* at 15 (quoting '721 Patent at
     6:11-12, 5:52, 5:67, 12:41).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   contends that the claim language is circular and fails to provide adequate notice to a POSITA of

2   the claims' metes and bounds.[15]

3         The Court concludes that Dolby has not shown that "the user" is indefinite with clear and

4   convincing evidence, as it is required to do under 35 U.S.C. § 112.  Dolby demonstrates that the

5   '721 Patent defines the contested term broadly such that it encompasses many different potential

6   users.  But, as Intertrust observes, just because the invention "could be used by a wide variety of

7   computer users" does not prove "that the scope of the claims cannot be reasonably ascertained by

8   a POSITA."  Reply at 10.  Dolby's protest, for example, that the specification allows for "a

9   government or commercial organization as a whole [to] be the user," as well as "an individual

10  employee," Demonstratives at 47, does not illustrate that the disputed term is indefinite, only that

11  corporate entities and individuals alike may be "users" of the patent.  Moreover, Intertrust supports

12  its position with apposite caselaw.  In *In re Downing*, for example, the Federal Circuit rejected the

13  argument that claims were indefinite due to the lack of an explicit antecedent for the term "the end

14  user" because, in the court's view, the "recitation of one end user could only refer to the end user

15  using the product."  *See* Opening Br. at 13 (quoting 754 Fed. Appx. 988, 996 (Fed. Cir. 2018)).

16  "Who else could the end user be?" the court rhetorically asked.  754 Fed. Appx. at 996.  Similarly,

17  in *Intellectual Ventures II LLC v. BITCO General Insurance*, the Eastern District of Texas

18  disagreed with the contention that a claim's references to "many potential users," rather than one

19  "particular user," rendered it indefinite.  Reply at 9 (quoting 2016 WL 125594, at *16 (E.D. Tex.

20  Jan. 11, 2016)).  The court concluded that "the claim [was] not required to make such an

21  identification" since "the 'particular' user [was] merely one of the 'one or more potential users.'"

22  2016 WL 125594 at *16.  Intertrust persuasively argues that, as in *Intellectual Ventures II*, "the

23  'users' described by the specification are [all] potential users of a computer system."  Reply at 9.

24        In sum, the Court agrees with the substance of Intertrust's argument here.  It nevertheless

25  concludes that some additional clarification regarding the object of the "use" would be helpful.  As

26

27  _____

    [15] The parties also dispute the significance of the '721 Patent's prosecution history.  *See* Opening

28  Br. at 16-17, Responsive Br. at 15-16.  The Court, however, finds these arguments largely
    unilluminating.

Intertrust argued at the hearing (consistently with its briefing; *see* Reply at 9) that "the user" refers to "the person or entity using an electronic appliance," the Court adopts that formulation.

The Court therefore construes the claim term "the user" to mean "the person or entity using an electronic appliance."

8.   "generating a progression of check values, each check value in the progression being derived from a portion of the block of data and from at least one other check value in the progression"

| Claim Term | Claim(s) | Intertrust's Proposed Construction | Dolby's Proposed Construction | Court's Construction |
|---|---|---|---|---|
| "generating a progression of check values, each check value in the progression being derived from a portion of the block of data and from at least one other check value in the progression" | '602 Patent (claim 25) | plain and ordinary meaning | indefinite | plain and ordinary meaning |

Claim 25 of the '602 Patent recites "[a] method for encoding a block of data in a manner designed to facilitate fault-tolerant authentication."[16]  '602 Patent at Clm. 25.  The first step

---

[16] Intertrust explains that a "problem that arises in the authentication of data streams and other data files is that of errors introduced by the communication system and/or storage media." *Id.* (quoting '602 Patent at 12:4-12).  "These errors . . . can cause authentication to fail, potentially requiring re-transmission of the encoded data," *id.*, and so creating "a need for authentication schemes that exhibit fault tolerance," *id.* at 18 (quoting '602 Patent at 12:33-41); *see also* Responsive Br. at 18 (describing the invention's purpose, as stated in '602 Patent at 6:35-41, as "obviating the need to receive and store [an] entire [encrypted] communication before verifying its signature and releasing it to the end user").

United States District Court
Northern District of California

1    comprising the method is:

2        • **generating a progression of check values, each check value in the progression**
3            **being derived from a portion of the block of data and from at least one other**
4            **check value in the progression.**

5    *Id.*

6        The issue here concerns the requisite initial check value in the claimed progression,

7    specifically whether it can be derived as part of a progression in which "each check value" is

8    derived "from at least one other check value in the progression."  While Intertrust contends that

9    progressions of the type referenced in Claim 25 implicitly require a predefined initial value,

10    Opening Br. at 18-19, Dolby argues that "a POSITA would not understand how to generate the

11    progression because the *first* check value in the progression could not possibly depend from 'at

12    least one other check value *in the progression*,' as the claim requires," Responsive Br. at 19

13    (citing Docket No. 80-5 ("Black Decl.") ¶ 36).  Dolby therefore concludes that the contested claim

14    term is indefinite.

15        Dolby's argument is based on the expert testimony of Dr. Black, who asserts that "a

16    POSITA would not have been reasonably certain . . . how the progression starts, where the

17    progression starts, or whether there is a starting point at all."  Responsive Br. at 19 (citing Black

18    Decl. ¶¶ 35-38.  Dolby stresses that the claim language "provides that '*each* check value in the

19    progression' is '*derived* from a portion of the block of data and *from at least one other check*

20    *value in the progression*."  *Id.* (quoting '602 Patent at Clm. 25).  This wording raises the question

21    of where the *initial* check value comes from, as it cannot logically be "derived from . . . one other

22    check value in the progression": at the time that it is generated, it is the first and only check value.

23    *See id.* (citing Black Decl. ¶ 36).  Intertrust itself acknowledges "that the initial term in the

24    claimed 'progression' cannot be based on a predecessor value because such a value cannot

25    possibly exist."  Opening Br. at 19 (citing Jakobsson Decl. ¶ 72).  A POSITA is therefore "left

26    with no objective boundaries on what comprises the first check value in the progression, how it

27    relates to any other check values, and what about that relationship makes the check values a

28    progression."  Responsive Br. at 19.

1        Intertrust responds by suggesting, via its expert Dr. Jakobsson, that the type of

2   "progression" referred to in Claim 25 "typically" begins with a given, or "predefined," initial term.

3   Opening Br. at 19 (citing Jakobsson Decl. ¶ 68).   Intertrust offers as a well-known example of

4   such a progression the Fibonacci sequence, which necessarily "has two initial values on which the

5   other values of the progression depend[]," *id.*, but which need not specify the "specific value(s) of

6   the initial value(s)" for the progression to work, Reply at 11 n.13.   As further evidence of this tacit

7   requirement, Intertrust points to the '602 Patent's specification, which (in figure 4) "teaches use of

8   a predefined value—a 'pattern'—in combination with a hash of the last sub-block of data."

9   Opening Br. at 19 (citing '602 Patent at Fig. 4).   This preferred embodiment, Intertrust argues,

10  must be taken into account when construing claim language that does not explicitly include a

11  given requirement.   *See id.* at 20; *see also Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357

12  F.3d 1319, 1336 n.19 (Fed. Cir. 2004) (stating that claim constructions "that do not read on the

13  preferred embodiment are rarely, if ever, correct and would require highly persuasive evidentiary

14  support") (internal quotations omitted).   Additionally, Dr. Jakobsson cites to dictionaries

15  (technical and otherwise) to show that a progression, by definition, "requires an initial term" based

16  on "an algorithm, uniform law, or constant law."   Opening Br. at 21; *see also* Jakobsson Decl. ¶¶

17  62 (quoting multiple dictionaries that define "progression" as, *e.g.*, "a sequence of numbers or

18  terms in which each can be derived from its predecessor using a constant formula").   Dr.

19  Jakobsson posits that "just as the definitions do not specify the algorithm, law or a formula that

20  would be used to determine the subsequent terms of the 'progression', they do not expressly call

21  out that the 'progression' must contain an initial term" because this commonsensical requirement

22  "would be understood by the POSITA reading these definitions."[17]   Jakobsson Decl. ¶ 71.

23         The Court finds that Intertrust has presented sufficient evidence to show that a POSITA

24  would have understood that the claimed progression requires a predefined initial value, and that

25  the disputed term is not indefinite.   There is little question that Dolby has identified a flaw in the

26

27  _____

28  [17] Intertrust also suggests that Dolby's arguments go more to issues of enablement than
    indefiniteness, as the question of *how* to generate the initial check value is irrelevant to the
    definiteness inquiry concerning the clarity of the invention's scope.   Opening Br. at 21.

1   wording of Claim 25, at least when read literally.  But claim terms are to be construed "not only in

2   the context of the particular claim in which the disputed term appears, but in the context of the

3   entire patent, including the specification."  *Phillips*, 415 F.3d at 1313.  Here, Intertrust has shown

4   that the specification, in figure 4, "teaches use of a predefined initial value . . . to start the claimed

5   progression."  Reply at 12 (citing '602 Patent at 9:18-27).



FIG. 4

(non-limiting example for illustration)

20   As the parties clarified at the hearing, box 406 in figure 4 represents the predefined value, from

21   which is ultimately derived the subsequent check values (represented by boxes H(Cn), H(C1), and

22   so on) in the progression.  *See* Hearing Tr. at 81-82, 85.  The specification thus provides

23   compelling intrinsic evidence that the disputed term presupposes a given initial value even though

24   Claim 25 does not expressly require one.[18]

25       This construction finds further support in Intertrust's dictionary definitions, which are

_____

[18] As noted above, while "limitations from the specification are not to be read into the claims," *Comark*, 156 F.3d at 1186, courts generally "do not interpret claim terms in a way that excludes disclosed examples in the specification."  *Verizon*, 503 F.3d at 1305.

United States District Court
Northern District of California

often helpful "in determining the meaning of particular terminology to those of skill in the art." *See Phillips*, 415 F.3d at 1318.  The dictionaries cited by Dr. Jakobsson all define "progression," with minor variations, as "a sequence of numbers or terms in which each can be derived from its predecessor using a constant formula."  *See* Opening Br. at 21 n.23.  As such a progression evidently requires some initial value that is not expressly accounted for by the definitions, they are either universally incoherent or they silently assume the existence of a predefined value.  The Court concludes that the latter scenario is the more likely.  In any event, Dolby has not shown with clear and convincing evidence that a POSITA would have failed to understand how the claimed progression works, as it must under 35 U.S.C. § 112.

The Court therefore construes the claim term "generating a progression of check values, each check value in the progression being derived from a portion of the block of data and from at least one other check value in the progression" in accordance with its plain and ordinary meaning, as Intertrust proposes.

9.   "each error-check value being operable to facilitate authentication of a portion of the block of data and of a check value in the progression of check values"

| Claim Term | Claim(s) | Intertrust's Proposed Construction | Dolby's Proposed Construction | Court's Construction |
|---|---|---|---|---|
| "each error-check value being operable to facilitate authentication of a portion of the block of data and of a check value in the progression of check values" | '602 Patent (claim 25) | plain and ordinary meaning | indefinite | plain and ordinary meaning |

United States District Court
Northern District of California

1       As discussed above, Claim 25 of the '602 Patent recites "[a] method for encoding a block

2 of data in a manner designed to facilitate fault-tolerant authentication." '602 Patent at Clm. 25.

3 The second step of the method is:

4          •  generating an encoded block of data, comprising:

5             inserting error-check values into the block of data, **each error-check value being**

6             **operable to facilitate authentication of a portion of the block of data and of a**

7             **check value in the progression of check values.**

8 *Id.*

9       As before, Intertrust proposes that the claim term bears its plain and ordinary meaning to a

10 POSITA, while Dolby argues that the term fails for indefiniteness.  In its briefing, Dolby contends

11 that the term lacks "clarity as to the relationship between the claimed error-check value and the

12 check value such that 'each error-check value' is 'operable to facilitate authentication of . . . a

13 check value in the progression of check values.'"  Responsive Br. at 22.  At the hearing, however,

14 Dolby focused on the term's use of "facilitate," which Dolby argued is "amorphous" and

15 "subjective."  Hearing Tr. at 88.  Dolby thus urges that "facilitate" does not provide an "objective

16 measure" of how much "easier or more convenient" the claimed method makes fault-tolerant

17 authentication and is therefore indefinite.  *See id.*

18       Intertrust argues that, in accordance with the plain and ordinary meaning of the contested

19 term, "[a]n error check value is 'operable to facilitate authentication' of a data block portion and a

20 check value if it consists of data that would *ease* the authentication process."  Opening Br. at 22

21 (emphasis added).  Regarding Dolby's argument about the lack of clarity in the relationship

22 between error-check values and check values, Intertrust explains that "both the error-check values

23 and the check values are based on corresponding data block portions" and are therefore "related."

24 *Id.* at 23.  This relationship, in turn, "allows the error-check values to be used to facilitate the

25 authentication of the check values."[19]  *Id.* (citing '602 Patent at 4:36-42).  And regarding Dolby's

26

27     [19] Put another way, "claim 25 provides that each corresponding check value and error-check value
are related because they derive from the same portion of the block of data.  Without this

28 relationship, the error-check value could not serve to facilitate authentication of the check value if
that data block portion is corrupted."  Opening Br. at 24.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    complaints about the term's excessively vague use of "facilitate," Intertrust explains that the

2    claimed method simply "make[s] easier the authentication of a portion of the block of data and of

3    a check value in the progression of check values."  *See* Jakobsson Decl. ¶ 78.  Beyond this,

4    Intertrust argues, the claim need not specify "the degree of facilitation" that the method

5    accomplishes in a "quantitative" manner.  *See* Hearing Tr. at 92-93.  Intertrust therefore concludes,

6    drawing from the '602 Patent's specification, that "each error-check value being operable to

7    facilitate authentication" simply means "that the error-check values '***can be used to help***

8    authenticate the check values in the progression.'"  Opening Br. at 24 (quoting '602 Patent at

9    4:36-42).

10          Dolby responds that "the claim requires some relationship between the error-check value

11   and the check value."  Responsive Br. at 22.  In its view, Intertrust defines that relationship simply

12   as any method "that makes it possible to authenticate a portion of the data and a check value in ***a***

13   ***more convenient manner*** than using a method that does not employ its claimed fault-tolerant

14   authentication process."  *Id.* (quoting Opening Br. at 23).  This vague construction, Dolby's expert

15   Dr. Black argues, illustrates why "a POSITA would not have been able to reasonably ascertain the

16   bounds of [the relationship between the error-check value and the check value] to determine the

17   scope of Claim 25."  *Id.* (quoting Black Decl. ¶¶ 40-41).  Further, Dolby argues that an error-

18   check value cannot "be 'operable' to do anything," since it represents only "a value, not an

19   instruction or operation to be 'done' or 'put into practice.'"  *Id.* at 25 (citing Black Decl. ¶ 43).

20   Intertrust, however, interprets "operable to facilitate" as functionally equivalent to "may

21   facilitate," and so effectively reads "operable" out of the claim language.  *See id.*  Such a

22   maneuver, Dolby concludes, contravenes the prosecution history, which suggests that the

23   "operable to facilitate" limitation was important to the examiner's allowance of Claim 25 over the

24   prior art.  *Id.* at 24-25.  Lastly, Dolby cited caselaw at the hearing purportedly standing for the

25   proposition that a claim term making a process "more convenient" is indefinite because it does not

26   provide "any objective basis" for determining whether such enhanced convenience has occurred.

27   *See* Hearing Tr. at 66 (quoting *Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*, 382 F.

28   Supp. 3d 586, 609-10 (E.D. Tex. 2019).

United States District Court
Northern District of California

1    The Court once again finds that Dolby has failed to carry its burden of proving, with clear

2    and convincing evidence, that the claim term is indefinite.  Dolby's principal complaint in the

3    briefing is that the claim language does not explicitly require "that the portion of data to which an

4    error check value corresponds is the same portion from which a check value is derived," contrary

5    to Intertrust's representations.  Responsive Br. at 23; *see also* Opening Br. at 23-24 (stating

6    Intertrust's position that in Claim 25 "each check value is derived in part from a portion of the

7    block of the data" and "each error-check value comprises a hash of that portion").  Intertrust seeks

8    to rule out alternative possibilities by pointing out that "the specification does *not* describe any

9    error detection logic that uses an error check value to authenticate a check value derived from a

10   *different* block of data."  Reply at 14 (emphasis added).  And this is unsurprising, Intertrust

11   explains, because error-check values "can only help facilitate the authentication of check values

12   based on the same data block."  *Id.* (citing Jakobsson Decl. ¶ 82).  The Court finds this evidence

13   sufficient to conclude that a POSITA would likely have understood the disputed term to include

14   the implied limitation "that the portion of data to which an error check value corresponds is the

15   same portion from which a check value is derived."  *See* Responsive Br. at 23.

16   The Court is also not persuaded by Dolby's argument, which it focused on almost

17   exclusively at the hearing, that the disputed term must specify the degree of facilitation that the

18   claimed method achieves.  While the phrase "operable to facilitate authentication" may be

19   unwieldy, it appears to mean simply that the invention "can be used to help," or make easier,

20   authentication.  *See* Reply at 15 (citing Jakobsson Decl. ¶¶ 78-79).  This limitation makes sense in

21   the context of Claim 25 as a whole, which (as noted above) recites a method that "make[s] it easier

22   to authenticate [a block of data] in a fault-tolerant manner."  *See* Opening Br. at 17.  Dolby itself

23   explains that the '602 Patent was intended to solve "a problem in the prior art [whereby] 'the

24   recipient must receive the entire [communication] . . . before checking its authenticity,' requiring

25   the recipient to have 'enough storage to hold the entire [communication],' and 'wait however long

26   is needed to receive it.'"  Responsive Br. at 18 (quoting '602 Patent at 2:37-41).  The invention

27   purports to resolve this problem by "enabling the recipient . . . to verify the authenticity of the

28   communication on-the-fly, thus obviating the need to receive and store the entire communication

United States District Court
Northern District of California

before verifying its signature and releasing it to the end user." *Id.* (quoting '602 Patent at 6:35-41).  The disputed term's "operable to facilitate authentication" language may therefore be taken to refer to the broader fault-tolerant authentication process of which it is part, Hearing Tr. at 90-92, rather than to an abstract improvement lacking any comparative basis.  *Cf. Cypress Lake*, 382 F. Supp. 3d at 609-10 (finding claims that used the terms "convenient" and "conveniently" to describe a computer interface indefinite where "the intrinsic evidence [did] not provide an[y] objective criterion for determining what is 'more convenient'" than an alternative design).[20]

The Court therefore construes the claim term "each error-check value being operable to facilitate authentication of a portion of the block of data and of a check value in the progression of check values" in accordance with its plain and ordinary meaning, as Intertrust proposes.

## IV.      CONCLUSION

For the reasons given above, the Court construes the contested claim terms as follows:

- "rule" & "control information": "information and/or programming controlling operations on or use of digital files or electronic content"

- "receiving . . . separately" / "receiving, separately": "receiving in a different package and/or via delivery at a different time, over a different path, or from a different source"

- "receiv[ed/ing] . . . separately . . . and via separate delivery" / "receiving . . . independently . . . via separate delivery": "receiving via delivery at a different time, over a different path, or from a different source"

- "secure processing unit": "processing unit that makes information and processes resistant to unauthorized use"

- "rendering application" / "application program capable of rendering electronic content": "application program that processes content to present it through an audio output (*e.g.*, speakers) or display it on a video output (*e.g.*, a screen)"

---

[20] The Court notes that Dolby's analogy to the *Cypress Lake* case was inadequately presented, as Dolby neither mentioned the case in its briefing nor provided a thorough discussion of it at the hearing.  *See* Hearing Tr. at 89.

- "wherein the piece of electronic content comprises an authorizing document, and the second entity associates the second digital certificate with the authorizing document if the authorizing document originated from a certified entity": the claimed method includes an action ("associates . . .") to be performed by the second entity
- "the user": "the person or entity using an electronic appliance"
- "generating a progression of check values, each check value in the progression being derived from a portion of the block of data and from at least one other check value in the progression": plain and ordinary meaning
- "each error-check value being operable to facilitate authentication of a portion of the block of data and of a check value in the progression of check values": plain and ordinary meaning

**IT IS SO ORDERED**.

Dated: February 3, 2021

_____
EDWARD M. CHEN
United States District Judge